# UNITED MINE WORKERS OF AMERICA *v.* GIBBS.

No. 243.   Argued January 20, 1966.—Decided March 28, 1966.

716

*Willard P. Owens* argued the cause for petitioner. With him on the brief were *E. H. Rayson* and *R. R. Kramer.*

*Clarence Walker* argued the cause for respondent. With him on the brief was *William Ables, Jr.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

Respondent Paul Gibbs was awarded compensatory and punitive damages in this action against petitioner United Mine Workers of America (UMW) for alleged violations of § 303 of the Labor Management Relations Act, 1947, 61 Stat. 158, as amended,[1] and of the common law of

---

[1] Section 303 of the Labor Management Relations Act, 1947 provides:

"(a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158 (b) (4) of this title.

"(b) Whoever shall be injured in his business or property by reason [of] any violation of subsection (a) of this section may sue therefor in any district court of the United States subject to the limitations and provisions of section 185 of this title without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit." 29 U. S. C. § 187 (1964 ed.).

Section 158 (b) (4) of Title 29 U. S. C. (1964 ed.), § 8 (b) (4) of the National Labor Relations Act, as amended, 73 Stat. 542, provides, in relevant part, that:

"(b) It shall be an unfair labor practice for a labor organization or its agents—

.        .        .        .        .

"(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry

Tennessee. The case grew out of the rivalry between the United Mine Workers and the Southern Labor Union over representation of workers in the southern Appalachian coal fields. Tennessee Consolidated Coal Company, not a party here, laid off 100 miners of the UMW's Local 5881 when it closed one of its mines in southern Tennessee during the spring of 1960. Late that summer, Grundy Company, a wholly owned subsidiary of Consolidated, hired respondent as mine superintendent to attempt to open a new mine on Consolidated's property at nearby Gray's Creek through use of members of the Southern Labor Union. As part of the arrangement, Grundy also gave respondent a contract to haul the mine's coal to the nearest railroad loading point.

On August 15 and 16, 1960, armed members of Local 5881 forcibly prevented the opening of the mine, threatening respondent and beating an organizer for the rival union.[2] The members of the local believed Consolidated

affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise, handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

. . . . .

"(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided*, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing . . . ."

[2] These events were also the subject of two proceedings before the National Labor Relations Board. In one, the Board found that Consolidated had unlawfully assisted the Southern Labor Union in violation of § 8 (a)(2) of the National Labor Relations Act, as

had promised them the jobs at the new mine; they insisted that if anyone would do the work, they would. At this time, no representative of the UMW, their international union, was present. George Gilbert, the UMW's field representative for the area including Local 5881, was away at Middlesboro, Kentucky, attending an Executive Board meeting when the members of the local discovered Grundy's plan; [3] he did not return to the area until late in the day of August 16. There was uncontradicted testimony that he first learned of the violence while at the meeting, and returned with explicit instructions from his international union superiors to establish a limited picket line, to prevent any further violence, and to see to it that the strike did not spread to neighboring mines. There was no further violence at the mine site; a picket line was maintained there for nine months; and no further attempts were made to open the mine during that period.[4]

---

amended, 49 Stat. 452, 29 U. S. C. § 158 (a) (2) (1964 ed.), *Tennessee Consolidated Coal Co.,* 131 N. L. R. B. 536, enforcement denied *sub nom. Labor Board* v. *Tennessee Consolidated Coal Co.,* 307 F. 2d 374 (C. A. 6th Cir. 1962). In the other, it found that Local 5881 had engaged in coercive picketing in violation of § 8 (b) (1)(A), 61 Stat. 141, 29 U. S. C. § 158 (b)(1)(A) (1964 ed.), *Local 5881, UMWA,* 130 N. L. R. B. 1181. The International itself was not charged in this proceeding, and the Board's consideration focused entirely on the events of August 16.

[3] The only testimony suggesting that Gilbert might have been at the mine site on August 15–16 was Gibbs' statement that "Well, everything happened so fast there, I'm thinking that I seen Mr. Gilbert drive up there, but where he went, I don't know." Whether such testimony could ever be sufficient to establish presence we need not decide, since respondent effectively conceded in the Sixth Circuit and here that Gilbert was in Middlesboro when the violence occurred.

[4] Immediately after the Board's order in the proceedings against it, note 2, *supra,* Consolidated reopened the mine it had closed during the spring of 1960, and hired the men of Local 5881. Later, and while this litigation was awaiting trial, that mine was closed

Respondent lost his job as superintendent, and never entered into performance of his haulage contract. He testified that he soon began to lose other trucking contracts and mine leases he held in nearby areas. Claiming these effects to be the result of a concerted union plan against him, he sought recovery not against Local 5881 or its members, but only against petitioner, the international union. The suit was brought in the United States District Court for the Eastern District of Tennessee, and jurisdiction was premised on allegations of secondary boycotts under § 303. The state law claim, for which jurisdiction was based upon the doctrine of pendent jurisdiction, asserted "an unlawful conspiracy and an unlawful boycott aimed at him and [Grundy] to maliciously, wantonly and willfully interfere with his contract of employment and with his contract of haulage." [5]

The trial judge refused to submit to the jury the claims of pressure intended to cause mining firms other than Grundy to cease doing business with Gibbs; he found those claims unsupported by the evidence. The jury's verdict was that the UMW had violated both § 303 and state law. Gibbs was awarded $60,000 as damages under the employment contract and $14,500 under the haulage contract; he was also awarded $100,000 punitive damages. On motion, the trial court set aside the award of damages with respect to the haulage contract on the ground that damage was unproved. It also held that union pressure on Grundy to discharge respondent as supervisor would constitute only a primary dispute with Grundy, as respondent's employer, and hence was not cognizable as a claim under § 303. Interference with the

---

as the result of an accident. At this point, the fall of 1962, the Gray's Creek mine was opened using members of Local 5881.

[5] See *Dukes* v. *Brotherhood of Painters, Local No. 437*, 191 Tenn. 495, 235 S. W. 2d 7 (1950); *Brumley* v. *Chattanooga Speedway & Motordrome Co.*, 138 Tenn. 534, 198 S. W. 775 (1917); *Dale* v. *Temple Co.*, 186 Tenn. 69, 208 S. W. 2d 344 (1948).

employment relationship was cognizable as a state claim, however, and a remitted award was sustained on the state law claim.[6]  220 F. Supp. 871.  The Court of Appeals for the Sixth Circuit affirmed.  343 F. 2d 609.  We granted certiorari.  382 U. S. 809.  We reverse.

## I.

A threshold question is whether the District Court properly entertained jurisdiction of the claim based on Tennessee law.  There was no need to decide a like question in *Teamsters Union* v. *Morton,* 377 U. S. 252, since the pertinent state claim there was based on peaceful secondary activities and we held that state law based on such activities had been pre-empted by § 303.  But here respondent's claim is based in part on proofs of violence and intimidation.  "[W]e have allowed the States to grant compensation for the consequences, as defined by the traditional law of torts, of conduct marked by violence and imminent threats to the public order. *United Automobile Workers* v. *Russell,* 356 U. S. 634; *United Construction Workers* v. *Laburnum Corp.,* 347 U. S. 656. . . .  State jurisdiction has prevailed in these situations because the compelling state interest, in the scheme of our federalism, in the maintenance of domestic peace is not overridden in the absence of clearly expressed congressional direction." *San Diego Building Trades Council* v. *Garmon,* 359 U. S. 236, 247.

---

[6] The questions had been submitted to the jury on a special verdict form.  The suggested remittitur from $60,000 to $30,000 for damages on the employment contract and from $100,000 to $45,000 punitive damages was accepted by respondent.  In view of our disposition, we do not reach petitioner's contentions that the verdict must be set aside in toto for prejudicial summation by respondent's counsel, or because the actual damages awarded substantially exceeded the proof, and the punitive damage award may have rested in part on the award of actual damages for interference with the haulage contract, which was vacated as unproved.

The fact that state remedies were not entirely pre-empted does not, however, answer the question whether the state claim was properly adjudicated in the District Court absent diversity jurisdiction. The Court held in *Hurn* v. *Oursler,* 289 U. S. 238, that state law claims are appropriate for federal court determination if they form a separate but parallel ground for relief also sought in a substantial claim based on federal law. The Court distinguished permissible from nonpermissible exercises of federal judicial power over state law claims by contrasting "a case where two distinct grounds in support of a single cause of action are alleged, one only of which presents a federal question, and a case where two separate and distinct causes of action are alleged, one only of which is federal in character. In the former, where the federal question averred is not plainly wanting in substance, the federal court, even though the federal ground be not established, may nevertheless retain and dispose of the case upon the non-federal *ground;* in the latter it may not do so upon the non-federal *cause of action.*" 289 U. S., at 246. The question is into which category the present action fell.

*Hurn* was decided in 1933, before the unification of law and equity by the Federal Rules of Civil Procedure. At the time, the meaning of "cause of action" was a subject of serious dispute; [7] the phrase might "mean one thing for one purpose and something different for an-

---

[7] See Clark on Code Pleading 75 *et seq.* (1928); Clark, The Code Cause of Action, 33 Yale L. J. 817 (1924); McCaskill, Actions and Causes of Actions, 34 Yale L. J. 614 (1925); McCaskill, One Form of Civil Action, But What Procedure, for the Federal Courts, 30 Ill. L. Rev. 415 (1935); Gavit, A "Pragmatic Definition" of the "Cause of Action"? 82 U. Pa. L. Rev. 129 (1933); Clark, The Cause of Action, *id.,* at 354 (1934); Gavit, The Cause of Action—a Reply, *id.,* at 695 (1934).

other." *United States* v. *Memphis Cotton Oil Co.*, 288 U. S. 62, 67–68.[8] The Court in *Hurn* identified what it meant by the term by citation of *Baltimore S. S. Co.* v. *Phillips*, 274 U. S. 316, a case in which "cause of action" had been used to identify the operative scope of the doctrine of *res judicata*. In that case the Court had noted that " 'the whole tendency of our decisions is to require a plaintiff to try his whole cause of action and his whole case at one time.' " 274 U. S., at 320. It stated its holding in the following language, quoted in part in the *Hurn* opinion:

> "Upon principle, it is perfectly plain that the respondent [a seaman suing for an injury sustained while working aboard ship] suffered but one actionable wrong and was entitled to but one recovery, whether his injury was due to one or the other of several distinct acts of alleged negligence or to a combination of some or all of them. In either view, there would be but a single wrongful invasion of a single primary right of the plaintiff, namely, the right of bodily safety, whether the acts constituting such invasion were one or many, simple or complex.
>
> "A cause of action does not consist of facts, but of the unlawful violation of a right which the facts show. The number and variety of the facts alleged do not establish more than one cause of action so long as their result, whether they be considered severally or in combination, is the violation of but one right by a single legal wrong. The mere multiplication of grounds of negligence alleged as causing the same injury does not result in multiplying the causes of action. 'The facts are merely the means,

---

[8] See also *American Fire & Cas. Co.* v. *Finn*, 341 U. S. 6, 12; *Musher Foundation, Inc.* v. *Alba Trading Co.*, 127 F. 2d 9, 12 (C. A. 2d Cir. 1942) (dissenting opinion of Clark, J.).

and not the end. They do not constitute the cause of action, but they show its existence by making the wrong appear.' " *Id.,* at 321.

Had the Court found a jurisdictional bar to reaching the state claim in *Hurn,* we assume that the doctrine of *res judicata* would not have been applicable in any subsequent state suit. But the citation of *Baltimore S. S. Co.* shows that the Court found that the weighty policies of judicial economy and fairness to parties reflected in *res judicata* doctrine were in themselves strong counsel for the adoption of a rule which would permit federal courts to dispose of the state as well as the federal claims.

With the adoption of the Federal Rules of Civil Procedure and the unified form of action, Fed. Rule Civ. Proc. 2, much of the controversy over "cause of action" abated. The phrase remained as the keystone of the *Hurn* test, however, and, as commentators have noted,[9] has been the source of considerable confusion. Under the Rules, the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged.[10] Yet because the *Hurn* question involves issues of jurisdiction as well as convenience, there has been some tendency to limit its application to cases in which the state and federal claims are, as in *Hurn,* "little more than the equivalent of different epithets to characterize the same group of circumstances." 289 U. S., at 246.[11]

---

[9] Shulman & Jaegerman, Some Jurisdictional Limitations on Federal Procedure, 45 Yale L. J. 393, 397–410 (1936); Wechsler, Federal Jurisdiction and the Revision of the Judicial Code, 13 Law & Contemp. Prob. 216, 232 (1948); Barron & Holtzoff, Federal Practice and Procedure § 23 (1965 Supp.).

[10] See, *e. g.,* Fed. Rules Civ. Proc. 2, 18–20, 42.

[11] *E. g., Musher Foundation* v. *Alba Trading Co., supra;* Note, The Evolution and Scope of the Doctrine of Pendent Jurisdiction in the Federal Courts, 62 Col. L. Rev. 1018, 1029–1030 (1962).

This limited approach is unnecessarily grudging. Pendent jurisdiction, in the sense of judicial *power,* exists whenever there is a claim "arising under [the] Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority . . . ," U. S. Const., Art. III, § 2, and the relationship between that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional "case."[12] The federal claim must have substance sufficient to confer subject matter jurisdiction on the court. *Levering & Garrigues Co.* v. *Morrin,* 289 U. S. 103. The state and federal claims must derive from a common nucleus of operative fact. But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is *power* in federal courts to hear the whole.[13]

---

[12] The question whether joined state and federal claims constitute one "case" for jurisdictional purposes is to be distinguished from the often equally difficult inquiry whether any "case" at all is presented, *Gully* v. *First National Bank,* 299 U. S. 109, although the issue whether a claim for relief qualifies as a case "arising under . . . the Laws of the United States" and the issue whether federal and state claims constitute one "case" for pendent jurisdiction purposes may often appear together, see *Dann* v. *Studebaker-Packard Corp.,* 288 F. 2d 201, 211–215 (C. A. 6th Cir. 1961); *Borak* v. *J. I. Case Co.,* 317 F. 2d 838, 847–848 (C. A. 7th Cir. 1963), aff'd on other grounds, 377 U. S. 426.

[13] Cf. *Armstrong Co.* v. *Nu-Enamel Corp.,* 305 U. S. 315, 325. Note, Problems of Parallel State and Federal Remedies, 71 Harv. L. Rev. 513, 514 (1958). While it is commonplace that the Federal Rules of Civil Procedure do not expand the jurisdiction of federal courts, they do embody "the whole tendency of our decisions . : . to require a plaintiff to try his . . . whole case at one time," *Baltimore S. S. Co.* v. *Phillips, supra,* and to that extent emphasize the basis of pendent jurisdiction.

That power need not be exercised in every case in which it is found to exist. It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right.[14] Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them, *Erie R. Co.* v. *Tompkins*, 304 U. S. 64. Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.[15] Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.[16] Similarly, if it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and

[14] *Massachusetts Universalist Convention* v. *Hildreth & Rogers Co.*, 183 F. 2d 497 (C. A. 1st Cir. 1950); *Moynahan* v. *Pari-Mutuel Employees Guild*, 317 F. 2d 209, 211–212 (C. A. 9th Cir. 1963); *op. cit. supra*, notes 9 and 11.

[15] Some have seen this consideration as the principal argument against exercise of pendent jurisdiction. Thus, before *Erie*, it was remarked that "the limitations [on pendent jurisdiction] are in the wise discretion of the courts to be fixed in individual cases by the exercise of that statesmanship which is required of any arbiter of the relations of states to nation in a federal system." Shulman & Jaegerman, *supra*, note 9, at 408. In his oft-cited concurrence in *Strachman* v. *Palmer*, 177 F. 2d 427, 431 (C. A. 1st Cir. 1949), Judge Magruder counseled that "[f]ederal courts should not be over-eager to hold on to the determination of issues that might be more appropriately left to settlement in state court litigation," at 433. See also Wechsler, *supra*, note 9, at 232–233; Note, 74 Harv. L. Rev. 1660, 1661 (1961); Note, *supra*, note 11, at 1043–1044.

[16] Note, *supra*, note 11, at 1025–1026; *Wham-O-Mfg. Co.* v. *Paradise Mfg. Co.*, 327 F. 2d 748, 752–754 (C. A. 9th Cir. 1964).

left for resolution to state tribunals. There may, on the other hand, be situations in which the state claim is so closely tied to questions of federal policy that the argument for exercise of pendent jurisdiction is particularly strong. In the present case, for example, the allowable scope of the state claim implicates the federal doctrine of pre-emption; while this interrelationship does not create statutory federal question jurisdiction, *Louisville & N. R. Co.* v. *Mottley,* 211 U. S. 149, its existence is relevant to the exercise of discretion. Finally, there may be reasons independent of jurisdictional considerations, such as the likelihood of jury confusion in treating divergent legal theories of relief, that would justify separating state and federal claims for trial, Fed. Rule Civ. Proc. 42 (b). If so, jurisdiction should ordinarily be refused.

The question of power will ordinarily be resolved on the pleadings. But the issue whether pendent jurisdiction has been properly assumed is one which remains open throughout the litigation. Pretrial procedures or even the trial itself may reveal a substantial hegemony of state law claims, or likelihood of jury confusion, which could not have been anticipated at the pleading stage. Although it will of course be appropriate to take account in this circumstance of the already completed course of the litigation, dismissal of the state claim might even then be merited. For example, it may appear that the plaintiff was well aware of the nature of his proofs and the relative importance of his claims; recognition of a federal court's wide latitude to decide ancillary questions of state law does not imply that it must tolerate a litigant's effort to impose upon it what is in effect only a state law case. Once it appears that a state claim constitutes the real body of a case, to which the federal claim is only an appendage, the state claim may fairly be dismissed.

We are not prepared to say that in the present case the District Court exceeded its discretion in proceeding to judgment on the state claim. We may assume for purposes of decision that the District Court was correct in its holding that the claim of pressure on Grundy to terminate the employment contract was outside the purview of § 303. Even so, the § 303 claims based on secondary pressures on Grundy relative to the haulage contract and on other coal operators generally were substantial. Although § 303 limited recovery to compensatory damages based on secondary pressures, *Teamsters Union* v. *Morton, supra,* and state law allowed both compensatory and punitive damages, and allowed such damages as to both secondary and primary activity, the state and federal claims arose from the same nucleus of operative fact and reflected alternative remedies. Indeed, the verdict sheet sent in to the jury authorized only one award of damages, so that recovery could not be given separately on the federal and state claims.

It is true that the § 303 claims ultimately failed and that the only recovery allowed respondent was on the state claim. We cannot confidently say, however, that the federal issues were so remote or played such a minor role at the trial that in effect the state claim only was tried. Although the District Court dismissed as unproved the § 303 claims that petitioner's secondary activities included attempts to induce coal operators other than Grundy to cease doing business with respondent, the court submitted the § 303 claims relating to Grundy to the jury. The jury returned verdicts against petitioner on those § 303 claims, and it was only on petitioner's motion for a directed verdict and a judgment *n. o. v.* that the verdicts on those claims were set aside. The District Judge considered the claim as to the haulage

contract proved as to liability, and held it failed only for lack of proof of damages. Although there was some risk of confusing the jury in joining the state and federal claims—especially since, as will be developed, differing standards of proof of UMW involvement applied—the possibility of confusion could be lessened by employing a special verdict form, as the District Court did. Moreover, the question whether the permissible scope of the state claim was limited by the doctrine of pre-emption afforded a special reason for the exercise of pendent jurisdiction; the federal courts are particularly appropriate bodies for the application of pre-emption principles. We thus conclude that although it may be that the District Court might, in its sound discretion, have dismissed the state claim, the circumstances show no error in refusing to do so.

## II.

This Court has consistently recognized the right of States to deal with violence and threats of violence appearing in labor disputes, sustaining a variety of remedial measures against the contention that state law was pre-empted by the passage of federal labor legislation. *Allen-Bradley Local* v. *Wisconsin Board,* 315 U. S. 740; *United Construction Workers* v. *Laburnum Construction Corp.,* 347 U. S. 656; *United Automobile Workers* v. *Wisconsin Board,* 351 U. S. 266; *Youngdahl* v. *Rainfair, Inc.,* 355 U. S. 131; *United Automobile Workers* v. *Russell,* 356 U. S. 634. Petitioner concedes the principle, but argues that the permissible scope of state remedies in this area is strictly confined to the direct consequences of such conduct, and does not include consequences resulting from associated peaceful picketing or other union activity. We agree.

Our opinions on this subject, frequently announced over weighty arguments in dissent that state remedies

were being given too broad scope, have approved only remedies carefully limited to the protection of the compelling state interest in the maintenance of domestic peace. Thus, in *San Diego Building Trades Council* v. *Garmon,* 359 U. S. 236, we read our prior decisions as only allowing "the States to grant compensation for the consequences, as defined by the traditional law of torts, of conduct marked by violence and imminent threats to the public order," *id.,* at 247, and noted that in *Laburnum*

> "damages were restricted to the 'damages directly and proximately caused by wrongful conduct chargeable to the defendants . . .' as defined by the traditional law of torts. . . . Thus there is nothing in the measure of damages to indicate that state power was exerted to compensate for anything more than the direct consequences of the violent conduct." *Id.,* 248, n. 6, at 249.

In *Russell,* we specifically observed that the jury had been charged that to award damages it must find a proximate relation between the violence and threats of force and violence complained of, on the one hand, and the loss of wages allegedly suffered, on the other. 356 U. S., at 638, n. 3. In the two *Wisconsin Board* cases it was noted that the State's administrative-injunctive relief was limited to prohibition against continuation of the unlawful picketing, not all picketing. 315 U. S., at 748; 351 U. S., at 269–270, n. 3. And in *Youngdahl,* the Court held that a state court injunction which would have prohibited all picketing must be modified to permit peaceful picketing of the premises. We said, "[t]hough the state court was within its discretionary power in enjoining future acts of violence, intimidation and threats of violence by the strikers and the union, yet it is equally clear that such court entered the pre-empted domain

of the National Labor Relations Board insofar as it enjoined peaceful picketing . . . ." 355 U. S., at 139.[17]

It is true that in *Milk Wagon Drivers Union* v. *Meadowmoor Dairies,* 312 U. S. 287, the Court approved sweeping state injunctive relief barring any future picketing in a labor dispute, whether peaceful or not. That case, however, was decided only on a constitutional claim of freedom of speech. We did not consider the impact of federal labor policy on state regulatory power. Moreover, as we recognized in *Youngdahl, supra,* at 139, the case was decided in the context of a strike marked by extreme and repeated acts of violence—"a pattern of violence . . . which would inevitably reappear in the event picketing were later resumed." The Court in *Meadowmoor* had stated the question presented as "whether a state can choose to authorize its courts to enjoin acts of picketing in themselves peaceful when they are enmeshed with contemporaneously violent conduct which is concededly outlawed," 312 U. S., at 292, and had reasoned that

> "acts which in isolation are peaceful may be part of a coercive thrust when entangled with acts of violence. The picketing in this case was set in a background of violence. In such a setting it could justifiably be concluded that the momentum of fear generated by past violence would survive even though future picketing might be wholly peaceful." *Id.,* at 294.

Such special facts, if they appeared in an action for damages after picketing marred by violence had occurred,

---

[17] In *Teamsters Union* v. *Morton, supra,* a similar analysis was applied to permit recovery under § 303 of damages suffered during a strike characterized by proscribed secondary activity only to the extent that the damages claimed were the proximate result of such activity; damages for associated primary strike activity could not be recovered.

might support the conclusion that all damages resulting from the picketing were proximately caused by its violent component or by the fear which that violence engendered.[18]   Where the consequences of peaceful and violent conduct are separable, however, it is clear that recovery may be had only for the latter.

In the present case, petitioner concedes that violence which would justify application of state tort law within these narrow bounds occurred during the first two days of the strike.   It is a separate issue, however, whether the pleadings, the arguments of counsel to the jury, or the instructions to the jury adequately defined the compass within which damages could be awarded under state law.   The tort claimed was, in essence, a "conspiracy" to interfere with Gibbs' contractual relations.   The tort of "conspiracy" is poorly defined, and highly susceptible to judicial expansion; its relatively brief history is colored by use as a weapon against the developing labor movement.[19]   Indeed, a reading of the record in this case gives the impression that the notion of "conspiracy" was employed here to expand the application of state law sub-

---

[18] It would of course be relevant if the Board had already intervened and as here, note 2, *supra,* issued an order which permitted the continuance of peaceful picketing activity.

[19] On the flexibility of "conspiracy" as a tort, see *Original Ballet Russe, Ltd.* v. *Ballet Theatre, Inc.,* 133 F. 2d 187, 189 (C. A. 2d Cir. 1943); *Riley* v. *Dun & Bradstreet, Inc.,* 195 F. 2d 812 (C. A. 6th Cir. 1952); Charlesworth, Conspiracy as a Ground of Liability in Tort, 36 L. Q. Rev. 38 (1920); Burdick, Conspiracy as a Crime, and as a Tort, 7 Col. L. Rev. 229 (1907); Burdick, The Tort of Conspiracy, 8 Col. L. Rev. 117 (1908).   The anti-labor uses of the doctrine are well illustrated in Sayre, Labor and the Courts, 39 Yale L. J. 682, 684–687 (1930).   Similar dangers are presented by the tort of malicious interference with contract, *id.,* at 691–695, a doctrine equally young which in its origins required a showing of interference by force, threats, or fraud, but does so no more, Sayre, Inducing Breach of Contract, 36 Harv. L. Rev. 663 (1923); Comment, 56 Nw. U. L. Rev. 391 (1961).

stantially beyond the limits to be observed in showing direct union involvement in violence.

Thus, respondent's complaint alleged "an unlawful conspiracy and an unlawful boycott . . . to maliciously, wantonly and willfully interfere with his contract of employment and with his contract of haulage." No limitation to interference *by violence* appears. Similarly, counsel in arguing to the jury asserted, not that the conspiracy in which the union had allegedly participated and from which its liability could be inferred was a conspiracy of violence but that it was a conspiracy to impose the UMW and the UMW's standard contract on the coal fields of Tennessee.[20] Under the state law, it would not have been relevant that the union had not actually authorized, participated in or ratified the particular violence involved or even the general use of violence. It would only be necessary to show a conspiracy in which the union had a part, and to show also that those who engaged in the violence were members of the conspiracy and their acts were related to the conspiracy's purpose.[21]

The instructions to the jury also appear not to have kept the conspiracy concept within any proper bounds. The charge instructed the jury separately on the § 303 and conspiracy claims, characterizing each as predicated on an assertion that there had been "unlawful" picketing action, and distinguishing one from the other on the basis that in the conspiracy claim "the lawfulness of the means rather than the lawfulness of the object or the pur-

---

[20] Respondent's attorney argued in summation:

". . . and here is the conspiracy. Mr. Pass [an official of petitioner's] testified, we want that contract all over this nation. That contract or better. I don't guess at that, there is his testimony. There is no deviation from that contract, Mr. Turnblazer so says, unless it is approved in Washington. They impose a nationwide contract all over this nation, all over. I don't care whether it is in Canada or West Virginia or California or Tennessee."

[21] Note 5, *supra*.

pose of the picketing . . . is controlling." But in charging the conspiracy claim, the court stressed that the "unlawfulness" of the picketing, rather than violence as such, would be controlling. Thus, in characterizing respondent's claim of a conspiracy intentionally to interfere with his contractual relations with Grundy, the trial judge said respondent asserted the interference to be "wrongful in that it was accomplished by unlawful means, including violence and threats of violence." Turning to the question of the international union's responsibility, he said this depended on a showing that it "was a party to a conspiracy pursuant to which the interference was committed." He defined conspiracy as

> "an agreement between two or more . . . to do an unlawful thing, or to do a lawful thing by unlawful means. . . . It is not essential to the existence of a conspiracy that the agreement between the conspirators be formally made between the parties at any one time, if, for example, two persons agreed to pursue an unlawful purpose or pursue a lawful purpose by unlawful means, then later a third person with knowledge of the existence of the conspiracy assents to it either impliedly or expressly and participates in it, then all three are conspirators in the same conspiracy. . . . [A]ll that is required is that each party to the conspiracy know of the existence of the conspiracy and that each agrees to assist in some manner in the furtherance of the unlawful purpose . . . or any unlawful means of accomplishing an unlawful purpose."

The trial judge then charged, in accordance with the Tennessee common law on conspiracy,[22] that the union, if a member of a conspiracy, would be liable for all acts "done in concert . . . with the common purpose, and to effect

---

[22] *Ibid.*

a common design," whether or not it had authorized, participated in, or ratified the particular acts. The jury was told it might award "only such damages as . . . he has sustained as a proximate and direct result of the action of the defendant," and that "[n]o award of damages can be made . . . on the basis of losses sustained . . . as a result of lawful activity upon the part of the defendant or its agents." Such instructions do not focus the jury's attention upon violence or threats of violence as the essential predicate of any recovery it might award.

### III.

Even assuming the conspiracy concept could be and was kept within limits proper to the application of state tort law under the pre-emption doctrine, reversal is nevertheless required here for failure to meet the special proof requirements imposed by § 6 of the Norris-LaGuardia Act:[23]

> "No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof."

Petitioner vigorously contends that § 6 applied to the state claims in this case; that, on this record, it cannot be charged with having participated in or authorized the violence of August 15–16; and that its acts once it learned of the violence fell short of what would be necessary to show either ratification of the violence or any intent to build its picketing campaign upon the fears the violence engendered. We agree.

---

[23] 47 Stat. 71, 29 U. S. C. § 106 (1964 ed.).

We held in *Brotherhood of Carpenters* v. *United States,* 330 U. S. 395, 403, that

> "whether § 6 should be called a rule of evidence or one that changes the substantive law of agency . . . its purpose and effect was to relieve organizations . . . and members of those organizations from liability for damages or imputation of guilt for lawless acts done in labor disputes by some individual officers or members of the organization, without clear proof that the organization or member charged with responsibility for the offense actually participated, gave prior authorization, or ratified such acts after actual knowledge of their perpetration."

Shortly thereafter, Congress passed the Labor Management Relations Act, which expressly provides that for the purposes of that statute, including § 303, the responsibility of a union for the acts of its members and officers is to be measured by reference to ordinary doctrines of agency, rather than the more stringent standards of § 6.[24] Yet although the legislative history indicates that Congress was well aware of the *Carpenters* decision,[25] it did not repeal § 6 outright, but left it applicable to cases not arising under the new Act. This selectivity is not surprising, for on state claims, though not on § 303 claims, punitive damages may be recovered. The driving force behind § 6 [26] and the opposition to § 303, even in its limited form,[27] was the fear that unions might be destroyed

---

[24] National Labor Relations Act, as amended, § 2 (13), 61 Stat. 139, 29 U. S. C. § 152 (13) (1964 ed.) ; Labor Management Relations Act, 1947, §§ 301 (e), 303 (b), 61 Stat. 157, 159, 29 U. S. C. §§ 185 (e), 187 (b) (1964 ed.).

[25] See, *e. g.,* S. Rep. No. 105, 80th Cong., 1st Sess., p. 21.

[26] The fullest statement of the basis for § 6 appears in S. Rep. No. 163, 72d Cong., 1st Sess., pp. 19–21.

[27] The present § 303 was introduced on the floor of the Senate by Senator Taft, in response to a more severe proposal which would

if they could be held liable for damage done by acts beyond their practical control. Plainly, § 6 applies to federal court adjudications of state tort claims arising out of labor disputes, whether or not they are associated with claims under § 303 to which the section does not apply.[28]

Although the statute does not define ".clear proof," its history and rationale suggest that Congress meant at least to signify a meaning like that commonly accorded such similar phrases as "clear, unequivocal, and convincing proof." Under this standard, the plaintiff in a civil case is not required to satisfy the criminal standard of reasonable doubt on the issue of participation, authorization or ratification; neither may he prevail by meeting the ordinary civil burden of persuasion. He is required to persuade by a substantial margin, to come forward with "more than a bare preponderance of the evidence to prevail." *Schneiderman* v. *United States*, 320 U. S. 118, 125. In our view, that burden was not met.[29]

---

have permitted injunctive relief as well as damages against secondary activity. 93 Cong. Rec. 4769–4770, 4833–4847, 4858–4875 (1947). The tenor of the opposition may be seen in those pages, and also at 93 Cong. Rec. 4765–4766 (remarks of Senator Thomas); 93 Cong. Rec. 6451–6452 (remarks of Senator Morse); 93 Cong. Rec. 6520–6521 (remarks of Senator Pepper).

[28] The argument might be made that if there were "clear proof" that the local union was responsible, the responsibility of the international union *vis-à-vis* its local would be governed by a less demanding standard than that applicable for determining the responsibility of a labor organization or its officers on the basis of the acts of "individual officers, members, or agents" of the organization. Since the local was not a party here, we have no occasion to assess this issue. Liability of the international union is premised on the acts of Gilbert and the UMW's other agents, or not at all.

[29] In charging the jury, the trial judge first instructed the jury at length that the plaintiff's burden was to prove his case by a preponderance of the evidence, and that "if the plaintiff carries the burden of proof by a preponderance of the evidence, however slight that preponderance might be, he has done all that is required of

At the outset, it is clear that the requisite showing was not made as to possible union authorization of or participation in the violence of August 15 and 16. Although it is undoubtedly true that the officers and members of Local 5881 were present in force at the mine site on those days, neither the Local nor they are parties to this suit. Mr. Gilbert, the UMW representative, had left the area for a business meeting before the series of events culminating in the violence, and immediately upon his return, the violence subsided. The Sixth Circuit conceded that "[t]he proofs were sketchy as to defendant's responsibility for the [first two days' violence]." This view accurately reflects the state of the record. Petitioner was not even aware of Grundy's plan to open the Gray's Creek mine until after the violence had occurred.

The remaining issue is whether there was clear proof that the union ratified the violence which had occurred. Preliminarily, we note that it would be inconsistent with the fabric of national labor policy to infer ratification from the mere fact that petitioner involved itself in the dispute after the violence had occurred, or from the fact that it carried on some normal union functions, such as provision of strike relief. A union would ordinarily

---

him and is entitled to a verdict." In connection with substantive discussion of the state claim, he then remarked:

"Before the defendant may be held responsible for the acts of its agents in entering into a conspiracy during the course of a labor dispute, there must be clear proof that the particular conspiracy charged or the act generally of that nature had been expressly authorized or necessarily followed from a granted authority by the defendant, or that such conspiracy was subsequently ratified by the defendant after actual knowledge thereof."

The phrase "clear proof," referred to just this once, was never explained. The possibility is strong that the jury either did not understand the phrase or completely overlooked it in the context of the lengthy charge given. No challenge is directly made to the charge, however, and it does not appear whether an objection was entered. Accordingly, we do not rest judgment on this point.

undertake these tasks during the course of a lawful strike. National labor policy requires that national unions be encouraged to exercise a restraining influence on explosive strike situations; and when they seek to do so, they should not for these activities be made to risk liability for such harm as may already have been done. The fact that ripples of the earlier violence may still be felt should not be permitted, and under § 6 is not permitted, to impose such liability. Because the dispute which sparked the violence will often continue, the union will feel a responsibility to take up the dispute as well as to curb its excesses. There can be no rigid requirement that a union affirmatively disavow such unlawful acts as may previously have occurred. Cf. *ILGWU* v. *Labor Board,* 237 F. 2d 545. What is required is proof, either that the union approved the violence which occurred, or that it participated actively or by knowing tolerance in further acts which were in themselves actionable under state law or intentionally drew upon the previous violence for their force.

The record here is persuasive that the petitioner did what it could to stop or curtail the violence. There was repeated and uncontradicted testimony that when news of the violence reached the meeting that Gilbert was attending, he was given firm instructions to return to the scene, to assume control of the strike, to suppress violence, to limit the size of the picket line, and to assure that no other area mines were affected.[30] He

---

[30] Other international union personnel were also later sent, perhaps in part because the union wanted to put its best foot forward in the NLRB proceedings, note 2, *supra,* which ensued. One such person testified,

". . . I explained to them that the labor board was there investigating and that certainly any mass picketing would only cause them a great deal of trouble, and instructed them that they should limit the number of their pickets and under no circumstances have any violence or any threats of violence to any person coming into or near that area."

succeeded. Although the day after his return two Consolidated officers were harassed by a large and unruly mob in a nearby town, this incident was unrelated to respondent, and was not repeated. There was no further violence at the mine site, and the number of pickets was reduced to a very few. Other mines in the immediate area, including two worked on lease by Gibbs, continued to operate, although strenuous effort was required to accomplish this; one union official testified, "I thought I was going to get whipped two or three times [by members of the Local who opposed this policy]." [31]

To be sure, there was testimony that Gilbert and, through him, the international union were not pleased with respondent's role in the abortive venture to open the Gray's Creek mines with members of the Southern Labor Union. A company officer testified that when the mines finally opened respondent was not hired, because "Had I hired Mr. Paul Gibbs none of these mines would be open today." Respondent testified that Gilbert had told him, shortly after assuming control of the strike, "I want you to keep your damn hands off of that Gray's Creek area over there, and tell that Southern Labor Union that we don't intend for you to work that mine." To another, Gilbert is alleged to have said, "Hell, we can't let that

---

[31] About six days after the violence, an earthmoving equipment salesman driving by the entrance to the mine site stopped to ask how he might get to another mine. Gilbert was present among the picketers, and gave him instructions. Gilbert told the salesman that he "couldn't get through" the road chosen, and should approach by another route; he said the salesman should tell any union men he met that he had spoken to Gilbert. A sinister cast can be put on this incident, but it shows clearly only that Gilbert was in control of the strike and that operations unrelated to Gray's Creek were not being interfered with. It is significant that the salesman did not claim to have been stopped by force or threatened in any way; it appears he did no more than seek directions, and received no more in return.

go on . . . Paul was trying to bring this other union in there, and [Gilbert said] he ain't going to get by with it." A third witness reported remarks of a similar tenor. Respondent testified that fear for his own safety caused him not to visit his mine leases after the events of August 15 and 16. His foreman testified to minor acts of violence at the mine site, never connected to any person or persons.

The relevant question, however, is whether Gilbert or other UMW representatives were clearly shown to have endorsed violence or threats of violence as a means of settling the dispute. The Sixth Circuit's answer was that they had. Its view of the record gave it

> "the impression that the threat of violence remained throughout the succeeding days and months. The night and day picketing that followed its spectacular beginning was but a guaranty and warning that like treatment would be accorded further attempts to open the Gray's Creek area. The aura of violence remained to enhance the effectiveness of the picketing. Certainly there is a threat of violence when the man who has just knocked me down my front steps continues to stand guard at my front door." 343 F. 2d, at 616.

An "impression" is too ephemeral a product to be the result of "clear proof." As we have said, the mere fact of continued picketing at the mine site is not properly relied upon to show ratification. But even accepting the passage as a holding that "clear proof" of UMW involvement is present, we do not so read the record.

If there was a remaining threat of violence here, it was a threat which arose from the context of the dispute, and not from the manner in which the international union was shown to have handled it. This dispute began when unemployed miners in the Appalachian hills dis-

covered that jobs they believed had been promised to them were being given to others behind their backs. In considering the *vicarious* liability of the international union, accommodation must be made for that fact. The record here clearly bears the construction that the international union exerted pressure to assure that respondent would lose his present jobs and obtain no more. But the record fails to rebut petitioner's contention that it had been unwilling to see its ends accomplished through violence, and indeed had sought to control the excesses which had occurred. Since the record establishes only peaceful activities in this regard on the part of petitioner, respondent was limited to his § 303 remedy. *Teamsters Union* v. *Morton, supra.* Although our result would undoubtedly be firmer if the petitioner had assured respondent that, having assumed control of the strike, it would prevent further violence, in the circumstances of this case the crucial fact of petitioner's participation in or ratification of the violence that occurred was not proved to the degree of certainty required by § 6.

*Reversed.*

THE CHIEF JUSTICE took no part in the decision of this case.

MR. JUSTICE HARLAN, whom MR. JUSTICE CLARK joins, concurring.

I agree with and join in Part I of the Court's opinion relating to pendent jurisdiction. As to Part II, I refrain from joining the Court's speculations about the uses to which it may put the pre-emption doctrine in similar future cases. The holding in Part III that the Norris-LaGuardia Act requires reversal here seems to me correct, but my interpretation of the statute is different and somewhat narrower than that of the Court.

The statutory requirement for union liability in this case is "clear proof of actual participation in, or actual

authorization of . . . [the unlawful acts], or of ratification of such acts after actual knowledge thereof." [1] The Court construes this provision as fixing a new test of the quantum of proof, somewhere between ordinary civil and criminal standards. I do not think the admittedly vague legislative history imports this reading, and I believe it introduces a revealing inconsistency since the new test could not be applied to criminal cases, concededly governed by the same statutory language, without standing the statute on its head by having it *reduce* present quantum-of-proof requirements in criminal cases, that is, proof "beyond a reasonable doubt." The best reading I can give the statute, absent more light than has been shed upon it in this case, is one directing it against a particular type of inferential proof of authority or ratification unacceptable to those who framed the law. For me, the gist of the statute is that in the usual instance a union's carrying on of its normal strike functions and its failure to take affirmative action to dispel misconduct are not in themselves proof of authorization or ratification of the wrongdoing. [2]

---

[1] Norris-LaGuardia Act, § 6, 47 Stat. 71, 29 U. S. C. § 106 (1964 ed.). The section is quoted in full at p. 735, *ante.*

[2] The principal legislative document, S. Rep. No. 163, 72 Cong., 1st Sess., pp. 19–21, is not very illuminating but it does at the end of its discussion of the section make reference to Frankfurter & Greene, The Labor Injunction 74–75 (1930). At these pages, to illustrate rulings on union responsibility that are deemed improper, that book states: " 'Authorization' has been found as a fact where the unlawful acts 'have been on such a large scale, and in point of time and place so connected with the admitted conduct of the strike, that it is impossible on the record here to view them in any other light than as done in furtherance of a common purpose and as part of a common plan'; where the union has failed to discipline the wrong-doer; where the union has granted strike benefits." (Footnotes omitted.) See also *id.,* at 220–221, n. 42; *United Brotherhood of Carpenters* v. *United States,* 330 U. S. 395, 418–419 and n. 2 (Frankfurter, J., dissenting).

In the present case, apart from a few quite ambiguous episodes, there was nothing to bring the violence home to the union except, as the Sixth Circuit stressed (see p. 741, *ante*), that the union continued through its picketing the threat that the earlier violence would be renewed and did not repudiate the violence or promise to oppose its renewal. Whatever arguments could be made for imposing liability in such a situation, I think it approximates what the statute was designed to forbid. On this basis, I concur in the reversal.