**BITMAR CORPORATION, a Delaware Corporation, Plaintiff,**

v.

**William DERRICKSON, Gregory Edwards, Jeffery Hoffman, Doyal H. Hodge, Michael Willis, and Price Waterhouse, LLP., Defendant.**

No. 96–842–Civ–T–17C.

United States District Court,
N.D. Florida,
Tampa Division.

June 17, 1998.

**1362**

Gary Nelson Strohauer, Baxter & Strohauer, P.A., Clearwater, FL, for plaintiffs.

Thomas E. Warner, Tim B. Wright, Warner, Fox, Seeley, Dungey & Sweet, Attorneys, P.A., Stuart, FL, for William Derrickson, defendant.

Timothy John Corrigan, Thomas More Beverly, Charles P. Pillans, III, Bedell, Dittmar, DeVault, Pillans & Coxe, P.A., Jacksonville, FL, Beth E. Luciano, AT & T Solutions Customer Care, Jacksonville, FL, for Gregory Edwards, defendant.

Jeffery Hoffman, Jensen Beach, FL, pro se.

Thomas John Roehn, Jodi L. Corrigan, Lorien S. Johnson, Annis, Mitchell, Cockey, Edwards & Roehn, P.A., Tampa, FL, for Michael Willis, Price Waterhouse LLP, defendants.

Stephen A. Scott, Law Office of Stephen A. Scott, Gainesville, FL, for Stephen A. Scott, movant.

### ORDER

KOVACHEVICH, Chief Judge.

This cause comes before the Court on Defendants, Willis and Price Waterhouse's, Motion for Summary Judgment (Docket No. 100), Memorandum in support thereof (Docket No. 101), depositions in support thereof (Docket No. 102–118), Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment (Docket No. 126), depositions and exhibits (Docket No. 129–141), the assigned Magistrate Judge's Report and Recommendation (Docket No. 194), Plaintiff's Objections to the Magistrate Judge's Report and Recommendation (Docket No. 206), Memorandum in Support thereof (Docket No. 207), Plaintiff's Supplemental Objections (Docket No. 208), and Defendant's Response to Plaintiff's Objections (Docket No. 213).

Plaintiff's Complaint alleges that the Defendants made false and misleading statements in connection with a stock purchase agreement.[1] The Complaint alleges five (5) causes of action: (1) Count 1 states a claim for violation of section 10(b) and rule 10b–5 of the Securities Exchange Act of 1934 against all Defendants; (2) Count II alleges that only Defendants, Derrickson, Edwards, Hoffman, and Hodge violated section 20 of the Securities Exchange Act of 1934; (3) Count III states a cause of action against all Defendants for negligent misrepresentation in violation of Florida Law; (4) Count IV alleges a violation of the Florida Securities Investors Protection Act ("FSIPA") against all Defendants; and (5) Count V sets forth a cause of action for fraud in violation of Florida Law.

In November 1992, Plaintiff Britmar Corporation ("Britmar" or "Plaintiff") entered into negotiations with Quadrex Corporation ("Quadrex"), a publicly held corporation in connection with a stock exchange agreement.

---

1. Defendants, Merrick, Edwards, and Hodge have been dismissed from this action. In addition, the Court adopted the Magistrate Judge's Recommendation that the Motion to Dismiss Defendants Hoffman and Derrickson be granted (Docket No. 170). As a result, Count II is no longer viable.

Quadrex was to purchase all of the stock of Britmar's wholly-owned subsidiary, Integrated Resource and Recovery ("IRR"), and in exchange, Britmar was to acquire 343,000 unregistered shares of Quadrex's stock. This suit arises from the allegations that Quadrex's financial statements, which were audited by Defendant Price Waterhouse, as well as filings made with the Securities Exchange Commission ("SEC"), which Defendant Willis and others at Price Waterhouse made on Quadrex's behalf, falsely represented the financial status of Quadrex.

Price Waterhouse became the auditor for Quadrex on May 8, 1991. Defendant Willis was originally the senior manager and later the audit partner assigned by Price Waterhouse to the Quadrex account. Plaintiff asserts that in 1991, Defendants Willis and Merrick [2], Price Waterhouse's audit manager for Quadrex, visited Quadrex's waste recycling center in Tennessee, referred to as the QRC. Defendant Merrick testified that during this visit, he and Defendant Willis noted that Quadrex had not disposed of several large jobs and that Quadrex may not have reserved enough money to complete the proper disposal of these radioactive wastes. (Merrick Depo. Ex. 151), During the 1991 and 1992 audits, Defendant Merrick also learned that the QRC was in violation of conditions of its Tennessee license to do business because the QRC had exceeded the one (1) year storage limitation on certain wastes. (Merrick Depo. at 439–41). Notwithstanding, Quadrex stated in its annual report for the fiscal year ending 1991 that "the Company eliminated $1,390,000 of the $2,033,000 December 31, 1990 provision which had been established for waste disposal at the Company's Recycle Center in Oak Ridge, Tennessee."

According to Plaintiff, Quadrex relied on its recycling services as its source of revenue. These services involved accepting nuclear waste materials from customers, decontaminating or treating those articles, and disposing of the radioactive waste and/or byproducts of the processing through burial at approved sites. Plaintiff asserts that Quadrex and its accountants knew that the true economic picture of the recycling activities was not only different from the one portrayed, but worked to conceal the fact that it was economically unsound.

The financial statement for the 1992 fiscal year reflects that Quadrex decreased its financial reserves again. Nevertheless, Defendants Price Waterhouse and Willis contend that they were informed by Quadrex that it was seeking an amendment to the Tennessee license to allow it to "free release" a portion of the contaminated waste and that Quadrex's financial statements were approved based on these representations. (Merrick Depo. at 238–39).

In addition to the understated disposal expenses, Plaintiff contends that Quadrex was facing other liabilities, such as tax costs, that were not properly reflected in its financial statements. Furthermore, Plaintiff contends that in early 1993, individuals at Price Waterhouse were aware that Quadrex was considering acquiring a facility in Ft. Lauderdale, Florida, which was later learned to be IRR. Also, there is evidence that Defendant Merrick learned that Quadrex anticipated closing the acquisition quickly.

In April 1993, representatives of Quadrex and Britmar's attorney began discussions with Joseph Moore, a partner at Price Waterhouse specializing in tax issues, regarding how to structure the Quadrex/IRR transaction. (Def.'s App. D–15; Moore Aff., Def.'s App. B at Tab 1; Page Aff. ¶ 11 & Ex. 5, Plaintiff's App. at Tabs 1 and 5). Mr. Moore stated that he never saw the proposed stock purchase agreement, which reflected that Britmar had been given Quadrex's audited financial statements, and that he was never told that Britmar would be given or rely on financial statements of Quadrex that had been audited by Price Waterhouse. (Moore Aff. ¶¶ 13–16).

On March 30, 1993, Defendant Willis gave Russell J. Hammer permission to use Price Waterhouse's opinion on Quadrex's 1992 annual report in its Form 10K filing with the SEC. The Form 10K was filed with the SEC on March 31, 1993. Moreover, Price Waterhouse gave Quadrex consent to use the financial statement audited by Price Waterhouse

2. *See supra* note 1.

as part of its S-3 registration statement to be filed with the SEC concerning the Quadrex/IRR transaction, which was filed with the SEC on May 13, 1993. Price Waterhouse reviewed and assisted Quadrex in preparing responses to SEC's comments following the filing of the S-3 registration form.

Although the Stock Purchase Agreement between Quadrex and Britmar states that Britmar received Quadrex's audited financial statement, this provision was not included in the terms of the preliminary letter agreement between Quadrex and Britmar dated March 18, 1993.

The instant Motion for Summary Judgment was referred to the Magistrate Judge and a hearing was held on the motion on April 27, 1998. Subsequently, the parties filed supplemental documents with the Court. The Magistrate Judge found that the statute of limitations on Count I had run as of the date of filing of the Complaint because Plaintiff did not discover any facts supporting Count I within one (1) year before the Complaint was filed. As a result, the Magistrate Judge recommends that summary judgment be granted on this Count.

The Complaint in this case was filed on April 29, 1996. In Count I, Plaintiff alleges that Defendants violated section 10(b) and rule 10b-5 of the Securities Exchange Act of 1934 by issuing and causing to be issued audited financial statements and documents filed with the SEC that were materially false and misleading.

Defendants maintain that Plaintiff knew all of the facts upon which it based this cause of action more than one (1) year before the Complaint was filed; therefore, the statute of limitations bars Count I of the Complaint. Conversely, Plaintiff contends that Defendants have failed to establish that Britmar discovered or should have discovered the fraudulent conduct outside of the statute of limitations period. Moreover, Plaintiff argues that, whether a plaintiff had sufficient facts to place him on inquiry notice of a claim for securities fraud under the SEC rule 10b-5, is a question of fact. Furthermore, Plaintiff contends that merely knowing that a statement was false is insufficient to start the one (1) year time period, but rather, the

plaintiff must also know that the representation was *knowingly* false.

In Defendants' Motion for Summary Judgment (Docket No. 100), the following facts are recited to demonstrate that Plaintiff had knowledge well before one (1) year prior to the day the Complaint was filed:

1. In July 1993, Plaintiff's president Page was given a memorandum outlining the "deception" at the Recycle Center which describes the central allegations of the Amended Complaint.

2. In August 1993, Quadrex Corporation ("Quadrex") made a public announcement about the core issues in this case that "startled" the investment community and caused Quadrex's stock price to "tumble". Plaintiff has admitted that the "startling" information, about the specific issues forming the basis of this complaint, aroused Plaintiff's curiosity and concern.

3. In December, 1993, a class action complaint was filed against Quadrex and defendant Derrickson. Plaintiff's president Page received this Complaint and read it. It is virtually identical to the Complaint filed by plaintiff in April 1996.

4. In April 1994, the Quadrex Board of Directors, of which Page was then a member, voted to file a claim against former officers and directors of Quadrex for essentially the identical bases of the claims Plaintiff has in this action.

5. On May 12, 1994, Plaintiff's Board of Directors instructed its officers to make this claim against Price Waterhouse for alleged damages sustained in the acquisition of Quadrex stock.

6. On October 18, 1994, plaintiff forwarded a demand letter to Price Waterhouse claiming that Price Waterhouse was responsible for the fraudulent misrepresentation of financial statements by Quadrex.

(Defs.' Mot. for Summ. Judg., Docket No. 100 at 5–6).

It is clear that Plaintiff had sufficient knowledge to bring suit at least as early as October 1994. The Court finds that the demand letter sent from Plaintiff Britmar, and signed by John Page, to Defendant Mike Willis, is most telling. The demand letter,

dated October 18, 1994, provides in pertinent part:

> As you are aware, Britmar sold its subsidiary, Integrated Resource recovery, to Quadrex in April of 1993 and received 343,000 shares of Quadrex stock as consideration. Reliance on the financial statements, as audited by your firm, was an integral part of the decision by the Britmar Board of Directors to enter into the transaction and accept stock as consideration. Clearly, subsequent events have shown that such financial statements were grossly mis-stated.
>
> For your information, I believe that the following parties also bear responsibility for the fraudulent mis-representation of the financial condition of Quadrex at the time of the transaction:
>
> William Derrickson
> Greg Edwards
> Rusty Hammer
> Jeff Hoffman
> Mike McGough
>
> I will be contacting each of the above parties, in addition to yourself, with a view to reaching a financial understanding to compensate Britmar for the damage caused by the fraudulent mis-representation.
>
> Please call me at your convenience to determine a mutually convenient time when we could meet in an attempt to resolve this issue in a spirit of cooperation rather than litigation.

Significantly, when the demand letter was written, Plaintiff had: (1) identified the parties which they deemed responsible; (2) stated the theory upon which they relied, to wit, fraudulent misrepresentation; and (3) acknowledged that litigation was an option if adequate compensation was not forthcoming. However, Plaintiff sat on its rights and did not file the instant suit until April 29, 1996.

■ The Court acknowledges that, "the question of whether a plaintiff exercised reasonable diligence is usually a question of fact for the jury to decide." *Lenz v. Associated Inns and Restaurants Co. of America*, 833 F.Supp. 362, 371 (S.D.N.Y.1993). Moreover, because the question of notice of fraud is for the trier of fact, the moving party has an extremely difficult burden to show that there exists no genuine issue of material fact regarding notice. *See Washington v. Baenziger*, 673 F.Supp. 1478, 1485 (N.D.Cal.1987); *SEC v. Seaboard Corp.*, 677 F.2d 1289, 1294 (9th Cir.1982). Furthermore, the uncontroverted evidence must irrefutably demonstrate that the plaintiff discovered or should have discovered the fraudulent conduct in order for summary judgment to be granted. *See Kramas v. Security Gas & Oil, Inc.*, 672 F.2d 766, 770 (9th Cir.1982).

In the instant case, the Defendants have satisfied their burden. This historical recording of the actual knowledge of the Plaintiff, which typically is not present in these types of cases, is extremely persuasive evidence. Essentially, Plaintiff's argument to rebut Defendants' proof is that Plaintiff did not have *enough* knowledge to bring this cause of action. Plaintiff represents that the Complaint was filed on April 29, 1996, because that was the last day of three (3) year statute of limitations period and it filed on the mere "hunch" that it had a cognizable claim.

■ Claims under the Securities Exchange Act of 1934, Section 10(b) and Rule 10b–5 "must be commenced within one year after the discovery of the facts constituting a violation." *Lampf, Pleva, Lipkind, Prupis and Petigrow v. Gilbertson*, 501 U.S. 350, 361–62, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). Importantly, Plaintiff only needed to discover the *facts* constituting a violation and not every intricate detail of the alleged wrongdoing. *See Harner v. Prudential–Bach Securities, Inc.*, 35 F.3d 565, 1994 WL 494871 (6th Cir.1994), *Anixter v. Home-Stake Production Co.*, 939 F.2d 1420, 1428 (10th Cir.1991) *rehearing granted in part*, 947 F.2d 897, *vacated on other grounds*, 503 U.S. 978, 112 S.Ct. 1658, 118 L.Ed.2d 382 (1992). Plaintiff must act diligently in order to assert that the limitations period had not yet run. However, there are several facts which demonstrate that Plaintiff has failed to exercise due diligence.

■ In July 1993, John Page, President of Plaintiff at the time, received a memorandum from Stephen Weinress, a member of Quadrex's Board of Directors. In that memorandum, Weinress wrote that there had been

"deception taking place at Quadrex's Recycle Center in Tennessee ("ORC")," which is a central issue in Plaintiff's cause of action. In Plaintiff's Amended Complaint, Plaintiff alleges that in August 1993, Quadrex "startled the investment community" by announcing a $7.5 million loss for its quarter ending June 30, 1993 and filing quarterly 10–Q for the period ending June 30, 1993, noting several adverse developments. The subsequent steep drop in stock prices was attributed to this announcement and the 10–Q filing. Although Plaintiff argues that these developments merely evidenced mismanagement at the time, the Court considers these facts as significant in light of the accusations Plaintiff was able to formulate in its October 1994 demand letter.

In addition, John Page became a member of Quadrex's Board of Directors in October 1993, and represented Plaintiff on Quadrex's Board. Mr. Page participated in a board meeting where he was advised that there was a "very serious" problem at the QRC. The problem dealt with the excess amount of radioactive waste material which was extremely costly to be disposed of as required. In December 1993, Mr. Page attended a meeting with the Tennessee environmental regulators where he learned that Quadrex was in noncompliance with its regulatory license and it had to dispose of a large amount of low level radioactive waste at a very high cost to Quadrex. However, Plaintiff contends that it was not put on notice of fraud because the situation only represented mismanagement and any suspicions were adequately explained away to conceal the fraud.

On December 10, 1993, Mr. Page participated in a Quadrex Board meeting during which he was advised that a class action had been filed by Quadrex's shareholders against Quadrex, its President, and its Chief Financial Officer. The allegations of that suit are practically indistinguishable from the allegations in the case at hand. Mr. Page, as Plaintiff's President, was familiar with the allegations of the class action and attended a meeting on April 5, 1994, where Quadrex's attorney discussed a proposed settlement of the class action.

Prior to April 1994, Mr. Page, as a member of the Quadrex Board participated in a decision to instruct Quadrex's CEO at the time to pursue former Quadrex officers and directors for misfeasance and malfeasance based on the same issues raised in the case at hand. On May 12, 1994, Plaintiff's own Board of Directors voted to pursue a claim against Price Waterhouse for damages allegedly caused by Price Waterhouse's audit of Quadrex's financial statements. It is apparent that, at this point in time, Plaintiff possessed sufficient information to provide a factual basis to initiate a claim against Price Waterhouse. It is inconceivable that Plaintiff did not learn of the pertinent facts until discovery was conducted in the instant suit, as Plaintiff now claims.

Plaintiff's unsupported assertion that it did not have a complete and total understanding of all the specific details of its claim against Price Waterhouse until it hired an accountant to prepare a formal report on the subject in August 1995, is not sufficient to avoid summary judgment. Although Plaintiff argues that the Magistrate Judge improperly placed the burden on Plaintiff to demonstrate that Plaintiff did not violate the statute of limitations, it is clear that the appropriate burden was placed on Defendant. The Defendant sufficiently demonstrated that there was not a genuine issue of material fact regarding Plaintiff's knowledge of the alleged fraud well before one (1) year prior to the date the Complaint was filed in this case. Only after Defendant satisfied its burden, was Plaintiff required "to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing there is a genuine issue for trial.' " *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Consequently, summary judgment is appropriate with regards to Count I.

■ In addition, the Magistrate Judge recommends that, since Count I should be dismissed, all of the pendent state law claims should be addressed by the state court. In the R & R, the Magistrate Judge explains that the standard to be applied, with regards to Count III, to determine whether Defendants owed a duty of care to Plaintiff under the facts of this case is governed by the Florida Supreme Court's decision in *First Florida Bank, N.A. v. Max Mitchell & Co.,* 558 So.2d 9 (Fla.1990). However, the Court

has been unable to find a published opinion from a Florida court considering whether an accountant's consent to the public filing of an audited financial statement creates a duty of care running from the accountant to individuals who the accountant knows, at the time the consent was given, were in active negotiations to invest in the company to which the financial statement pertained. The Magistrate Judge noted that courts outside of Florida that have addressed the application of § 552 Restatement (Second) of Torts standard in similar situations are divided on the question of whether the duty of care can be so broad.

Because it does not appear that Florida courts have addressed the question of whether "willful blindness" can constitute actual knowledge as defined and required in *Max Mitchell*, the facts of this case present a novel issue of Florida law on which neither the parties nor the Court, have been able to find any guiding precedent. The Magistrate Judge recommends that the Court refrain from ruling on this issue if Count I is dismissed because, pursuant to *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of the applicable law." *Id.* at 726, 86 S.Ct. 1130. Moreover, pursuant to 28 U.S.C. § 1367(c)(1), a district court may decline to exercise supplemental jurisdiction over a state law claim joined with a claim over which the court has original jurisdiction when the state claim raises a "novel or complex issue of State law." Furthermore, pursuant to 28 U.S.C. § 1367(c)(3) & (4), a district court may decline to exercise jurisdiction over a state claim if "the district court has dismissed all claims over which it has original jurisdiction" or "in exceptional circumstances, [when] there are other compelling reasons for declining jurisdiction."

The Court agrees with the Magistrate Judge that the parties would be better served by presenting the negligence cause of action in the state forum where the Max Mitchell rule was created and where it can best be interpreted. Moreover, since the Court finds that summary judgment is appropriate with regards to Count I, the only

federal question is dismissed and the Court no longer has original jurisdiction of this matter. Furthermore, there is no diversity among the parties. Therefore, the Court finds that 28 U.S.C. § 1367(c)(3) governs this matter and the Court declines to exercise jurisdiction over the remaining state law causes of action. Judicial economy will best be served if all of the pendant state law claims are tried in one (1) action. Accordingly, it is

**ORDERED** that the Magistrate Judge's R & R (Docket No. 194) be **ADOPTED;** Plaintiff's Objections be **OVERRULED; summary judgment is GRANTED with regards to Count I; Counts III, IV, and V be dismissed without prejudice;** Defendant Price Waterhouse's Motion to Amend Affirmative Defenses (Docket No. 142) be **DENIED as moot;** Plaintiff's Motion for Leave to Amend to Include Punitive Damage Claims Related to Counts II, III, and IV of the Amended Complaint and for Leave to Conduct Discovery as to the Financial Worth of Defendants Price Waterhouse and Michael Willis (Docket No. 160) be **DENIED as moot;** Defendants' Motion to Strike and Memorandum of Law in Support (Docket No. 150) be **DENIED; the Court retains jurisdiction over Defendants Price Waterhouse and Michael Willis' Motion for Rule 11 Sanctions (Docket No. 167) which has already been referred to the Magistrate Judge and will be addressed by separate Order.**