**FABRICO MANUFACTURING CORP., Plaintiff,**

v.

**WILSON SPORTING GOODS CO., William Dillon and Robin Martin, Defendants.**

**No. 85 C 71.**

United States District Court, N.D. Illinois, E.D.

April 27, 1987.

Margaret E. Chapello, Robert D. Tyler, Jr., Robin & Tyler, Robert S. Robin, Robin, Miller & Tabis, Henry S. Kaplan, Arne M. Olson, Dressler Goldsmith Shore Sutker & Milnamow, Ltd., Chicago, Ill., for plaintiff.

Stanley J. Adelman, Rudnick & Wolfe, Michael P. Fontana, Roger K. Heidenreich, Sonnenschein Carlin Nath & Rosenthal, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

PRENTICE H. MARSHALL, District Judge.

Before us is the motion of defendant Wilson Sporting Goods Company [Wilson] for summary judgment on all six counts of plaintiff Fabrico Manufacturing Corporation's [Fabrico's] complaint. The first five counts state claims for relief under state law. Count VI states a claim under the Racketeer Influenced and Corrupt Organizations Act [RICO], 18 U.S.C. § 1961 *et seq.*

Fabrico filed its complaint in the Circuit Court of Cook County, Illinois. The defendants removed it here pursuant to 28 U.S.C. § 1441. We have jurisdiction over the RICO claim under 28 U.S.C. §§ 1331 and 1337 and 18 U.S.C. § 1964. The state law claims are pendent to the RICO claim.

Most of the facts related to the RICO claim are not in dispute. Wilson manufactures footballs. One of the components of a football is the bladder, which retains the air inside the football. Before 1979 Wilson used bladders made exclusively from butyl rubber. In 1979 Wilson began experimenting with urethane bladders, which it hoped would leak less frequently than butyl rubber bladders do. At first Wilson purchased finished urethane bladders from other manufacturing companies; later Wilson itself began manufacturing urethane bladders.

Fabrico is one of the companies which manufactured urethane bladders for Wilson. Wilson first approached Fabrico in 1978 and asked Fabrico to assist Wilson to develop a new bladder. From 1978 to 1980, Fabrico helped Wilson redesign the bladder and search for suitable materials. According to Fabrico, it entered into this relationship with Wilson with the expectation that Fabrico would become Wilson's requirement supplier once Wilson settled on a new design. In fact Wilson purchased bladders from another manufacturing company, not Fabrico, and Fabrico's dealings with Wilson ended in early 1981.

Wilson and Fabrico resumed their association in mid–1982. Wilson was still not satisfied with the design of the bladders it was using. Robin Martin, a project engineer for Wilson, met with Fabrico's president, Ashley Ross, and director of engineering, James McKee, and proposed that Fabrico again work for Wilson to improve the bladder. At this meeting Ross expressed his dissatisfaction over Fabrico not getting Wilson's business in 1981. Ross told Martin that Fabrico would not do further developmental work for Wilson unless Fabrico was assured of becoming Wilson's supplier of the improved urethane bladder. According to Ross and McKee, Martin assured them that Fabrico would get Wilson's business.

Fabrico again commenced work to develop a new bladder. According to Fabrico, it developed certain information which it viewed as confidential and which it shared with Wilson only under the understanding that Fabrico would eventually get the business of mass-producing bladders for Wilson. Fabrico alleges, and produces evidence to support its allegation, that Wilson incorporated into the design of the improved urethane bladder some of the information Fabrico developed.

Fabrico never became Wilson's supplier. Fabrico did sell a limited number of bladders to Wilson for research purposes, but Wilson never ordered commercial quantities from Fabrico. Wilson itself now manufactures all the urethane bladders it uses in footballs.

In its complaint, Fabrico alleges that Wilson intentionally made fraudulent misrepresentations to Fabrico in order to induce Fabrico to assist Wilson with its research and development. Fabrico contends that it relied on a knowingly false promise by Wilson that Wilson would order from Fabrico the bladders Wilson would eventually use in production. In the RICO count, Fabrico further alleges that Wilson conducted the fraudulent activity via interstate mail and wires. Interstate mail and wire fraud—that is, violations of 18 U.S.C. §§ 1341 and 1343—constitute "racketeering activity." *Id.* § 1961(1). Fabrico alleges that Wilson's acts of mail and wire fraud amount to a pattern of racketeering activity, *see id.* § 1961(5), which violates 18 U.S.C. § 1962.

Wilson contends in its motion for summary judgment that Fabrico has not presented evidence of a pattern of racketeering activity. It refers to *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985), in which the Supreme Court declared that predicate acts must exhibit "continuity plus relationship" to constitute a pattern of racketeering activity within the meaning of RICO. Predicate acts related to a single fraudulent transaction, Wilson continues, lack the requisite continuity.

Recent decisions of our court of appeals have explicated the meaning of "continuity plus relationship." They highlight certain factors relevant to determining whether the standard is met: "[t]he number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes, and the occurrence of distinct injuries." *Elliott v. Chicago Motor Club Insurance,* 809 F.2d 347, 350 (7th Cir.1987).

These decisions have focused primarily on the number of schemes and victims. In *Elliott* the plaintiffs alleged that the defendant insurers had committed several acts of mail fraud over several years in furtherance of a scheme to defraud plaintiffs. The court found continuity lacking because all the "acts of alleged mail fraud

... related to the [plaintiffs'] attempt to settle one claim under their uninsured motorist insurance policy." *Id.* Moreover, although there were five plaintiffs who alleged they were victims, all of their claims arose "from the same automobile accident and the same insurance policy." *Id.* In *Marks v. Pannell Kerr Forster,* 811 F.2d 1108 (7th Cir.1987), the court upheld the dismissal of plaintiff's RICO claim because he "did not allege defendants defrauded other victims with similar racketeering activity and did not allege he has been defrauded more than once by the defendants through similar racketeering acts." *Id.* at 1111. In *Lipin Enterprises, Inc. v. Lee,* 803 F.2d 322 (7th Cir.1986), continuity was lacking even though defendant had engaged in twelve separate acts of mail fraud because the acts were "all designed to defraud one victim ... on one occasion." *Id.* at 324. The court stated that there "must be some indication of a 'threat of continuing activity' by the defendants, not just one instance of fraud with a single victim." *Id.*

■ In the case before us, Fabrico accuses Wilson of a single scheme to defraud a single victim. Fabrico does not suggest that Wilson's encounters with it from 1978 to 1981 were fraudulent. Nor does Fabrico suggest that Wilson has perpetrated frauds upon other manufacturers (or upon anyone else). Thus Fabrico does not claim that Wilson was engaged in the type of continuing activity at which RICO is aimed.

■ We recognize that Fabrico's alleged injury was not as discrete as the injuries alleged in some of the Seventh Circuit cases. In *Marks,* for example, the defendants allegedly diverted all at once the capital plaintiff had invested in twenty-one partnerships. In *Lipin,* the allegedly fraudulent scheme was perfected at the instant plaintiff bought a car dealership. Fabrico's alleged injury, by contrast, accumulated each time Fabrico shared a piece of confidential information with Wilson. The presence of distinct injuries is a factor which militates toward a finding that a RICO violation has occurred.

While Fabrico did not suffer injury at a single point in time, it has not alleged or

604

adduced evidence of the occurrence of distinct injuries which indicate a pattern of racketeering activity. The nature of the alleged scheme was such that it took time for Wilson to reap the benefits of its fraud. Wilson's benefit—acquisition for less than adequate compensation of Fabrico's confidential information—was a single, if extended, injury to Fabrico.

Turning to the last of the four factors highlighted in *Elliott*, we note that Fabrico has not presented evidence of a large number or variety of predicate acts committed over a long period of time. Fabrico's evidence of predicate acts consists of the deposition testimony and affidavit of its president, Ashley Ross, who recalls that he sent to or received from Wilson employees several interstate letters and telephone calls. Ross has only a vague recollection of the contents of those calls and letters. *See* Affidavit of Ashley Ross ¶ 16; Deposition of Ashley Ross at 603–06. Wilson contends that this evidence is not sufficient even to establish the existence of predicate acts of mail or wire fraud. We tend to agree with Wilson, but we do not base our decision on that ground. We do decide that Fabrico has not presented evidence from which the factfinder could reasonably conclude Wilson engaged in mail or wire fraud in a pattern of racketeering activity. Therefore Wilson is entitled to summary judgment on the RICO claim.

Although the two individual defendants did not move for summary judgment, it is appropriate to grant them summary judgment on the RICO claim. They are the agents through whom Fabrico alleged Wilson accomplished its racketeering activity. Consequently Fabrico had every incentive to introduce all its evidence against them in its response to Wilson's motion. For the reasons that Wilson is entitled to summary judgment, Martin and Dillon are too.

Fabrico's complaint sets forth five state law claims in addition to the RICO claim. Initially our jurisdiction over these claims rested on their pendent relationship to the federal RICO claim. Because we grant summary judgment to the defendant on the

RICO claim, we must reassess our jurisdiction over the state law claims.

Whether pendent jurisdiction should be assumed is an issue that "remains open throughout the litigation." [*United Mine Workers of America v.* ] *Gibbs*, 383 U.S. [715,] 726, 86 S.Ct. [1130,] 1139, 16 L.Ed.2d 218 [ (1966) ]. In particular, when the federal claims are disposed of before trial, the state claims should be dismissed without prejudice almost as a matter of course.

*Baltimore Orioles, Inc. v. Major League Baseball Players Association*, 805 F.2d 663, 682 (7th Cir.1986).

■ Of course we could retain the state law claims if we had diversity jurisdiction, but we do not; Fabrico, Martin, and Dillon are Illinois citizens. We also might retain the state claims for "pressing reasons," such as the running of the statute of limitations on those claims. *Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.*, 781 F.2d 604, 611–12 (7th Cir.1986). Because this case was removed here from the state court, we can remand it to that court, and the statute of limitations problem does not arise. Averting the costs of a second trial would also be a pressing reason, but averting a second summary judgment ruling is not. *See, e.g., id.* at 612.

ORDER

Summary judgment is granted to all defendants on Count VI of plaintiff's complaint and the clerk is directed to enter a final judgment dismissing Count VI with costs to defendants. Counts I through V are remanded to the Circuit Court of Cook County, Illinois.