879 F.2d 864
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Alvin HIGGINS, Plaintiff-Appellant,
v.
OIL, CHEMICAL AND ATOMIC WORKERS INTERNATIONAL UNION,
AFL-CIO; LOCAL Union No. 3-677 of the Oil,
Chemical and Atomic Workers
International Union.
Defendants-Appellees.
 No. 88-6272.
 United States Court of Appeals, Sixth Circuit.
 July 17, 1989.
 
 Before KENNEDY, RALPH B. GUY, Jr. and ALAN E. NORRIS, Circuit Judges.
 RALPH B. GUY, Jr., Circuit Judge.
 
 
 1
 Plaintiff, Alvin Higgins, brought a hybrid section 301 wrongful discharge-failure to represent action against his former employer, Nuclear Fuel Services (NFS), and both defendant unions. The district court ultimately granted summary judgment as to all defendants. Plaintiff now appeals from the grant of summary judgment to the union defendants only.
 
 
 2
 Upon review, we conclude that the district court decision should be affirmed, although we arrive at the result by a somewhat different route than did the district court.
 
 I.
 
 3
 In May of 1985, the collective bargaining agreement then in force between NFS and Local 3-677 of the Oil, Chemical and Atomic Workers International Union expired. A bitter and prolonged economic strike followed. During the course of the strike, seven striking employees, including plaintiff, were discharged for strike-related misconduct.
 
 
 4
 In previous strikes, when discharges of this nature had occurred, the union had always negotiated for the return to work of any discharged strikers as part of the strike settlement agreement. However, in this instance, NFS refused to return the strikers to work but ultimately agreed to submit the matter of their discharge to arbitration on a "just cause" basis.[1] The rank and file, including the seven discharged employees, were not happy with this proposed settlement. A representative of the international union, Able, and the president of Local 3-677, Tolley, met privately with the plaintiff and the other discharged workers. Able and Tolley told plaintiff and the others that they would convince the local union to pay the seven discharged strikers their regular wages and insurance premiums if they would not protest the proposed settlement. A speedy arbitration was also promised with a prediction of favorable results for the strikers. The strikers agreed and, at a general membership meeting of the union, held on March 30, 1986, the membership voted to pay the seven discharged workers:
 
 
 5
 Mr. Chairman, at this time I'd like to make a motion that in the event this contract is voted in, that we raise union dues in order [to] take care of these seven people on their regular wages plus insurance 'til they're back in the plant.
 
 
 6
 (March 30, 1986, Union meeting transcript, motion made by Robert Tilson--Plaintiff's Brief at 20). The membership then voted to ratify the new collective bargaining agreement with NFS.
 
 
 7
 The plaintiff's arbitration hearing took place on January 23 and March 2-3, 1987.[2] Higgins was represented by the general counsel of the international union. On April 30, 1987, the arbitrator issued his opinion holding against Higgins.[3] The union decided that, given the narrow scope of an arbitrator's decision, any attempt at judicial review would be futile. Plaintiff then instituted this action on October 19, 1987, alleging a breach of the duty of fair representation under section 301 of the Labor Management Relations Act, 29 U.S.C. Sec. 185, and pendent state claims for misrepresentation, intentional infliction of emotional distress, and equitable and promissory estoppel. (App. 9).
 
 
 8
 While plaintiff's federal case was pending, he and five of the other discharged workers brought a state court action against Local 3-677 in the Chancery Court for the First Judicial Division at Erwin, Tennessee. This case was instituted on November 24, 1987, and the complaint was subsequently amended to add the international union. The thrust of the state court complaint was that the union made an offer to the discharged strikers of continued wages and benefits in return for their dropping their resistance to the settlement offer made by NFS. The state plaintiffs alleged they accepted this offer and were receiving such payments but that, on November 20, 1987, the local union voted to stop further payments. In its prayer for relief, the state plaintiffs asked that the court determine:
 
 
 9
 that the vote which was taken by the membership of the Union as set forth herein on March 30, 1986, thereby approving for the Union to pay the wages of the six (6) plaintiffs through an increase in their membership dues as a binding contract and the consideration was paid by both the Union members by increasing their dues and by the six (6) plaintiffs in that this agreement should continue at least through the term of the contract which was negotiated between the Union and the management of Nuclear Fuel Services which was for a period of time running from March or April of 1986 and for a period of three (3) years.
 
 
 10
 (App. 89).
 
 
 11
 The local union did, in fact, terminate the wage payments in February 1988. On December 12, 1988, a Chancellor of the Unicoi County, Tennessee, Chancery Court, ruled in favor of plaintiffs in their state case. It was somewhat of an illusory victory for Higgins, however, since the Chancellor found a breach of contract, but found that plaintiffs were only entitled to a recovery of benefits from February 10, 1988, "until their cases are arbitrated or legally terminated or until the end of the contract between the union and the company, whichever shall occur first." (Plaintiff's Brief at 26).
 
 
 12
 Prior to the state court decision, the defendants in the instant federal case had moved for dismissal or summary judgment. On May 16, 1988, the district judge entered an order dismissing the employer, NFS, and dismissing all claims against the unions except the pendent promissory estoppel claim.[4] Subsequently, on October 5, 1988, the court dismissed the pendent state promissory estoppel claim on the basis of United Mine Workers v. Gibb, 383 U.S. 715 (1966) (App. 100). Plaintiff filed his notice of appeal on November 2, 1988.
 
 II.
 
 13
 Since this matter has now been litigated in both state and federal courts, it is not surprising that there would be some blurring of issues. Unfortunately, the parties have contributed to this blurring by not really joining issue on appeal. Plaintiff states the issue to be:
 
 
 14
 Does the federal common law doctrine of promissory estoppel or the federal labor law duty to fairly represent apply to representations and promises of continuing financial aid made by international and local union representatives in order to convince discharged union members to forego opposing the ratification of a collective bargaining agreement which does not provide for their reinstatement.
 
 
 15
 (Plaintiff's Brief at 1). Although it is somewhat difficult to understand the framing of the issue in this manner based upon the pleadings and the district court orders, the problem is compounded by the defendant's "counter-statement" of the issues with heavy emphasis on there being no disputed issues of material fact preventing the issuance of a summary judgment and res judicata. As to the former, the plaintiff makes no argument that there were material facts precluding a summary judgment. On the contrary, he argues that the case was wrongly decided as a matter of law. As to the res judicata argument, the state court judgment (which is the basis of the res judicata claim) did not even issue until one month after plaintiff had filed his notice of appeal in this case. Nonetheless, we find it puzzling that plaintiff scarcely addresses this issue in the reply brief. Plaintiff does succeed in his reply brief in further muddying the water, however, when he states:
 
 
 16
 Plaintiff is not challenging the adverse arbitration decision which was rendered subsequent to all the material union promises of continued financial support. Plaintiff is appealing the decision of the District Court which erroneously concluded that plaintiff's federal claims of "failure to fairly represent" during the ratification process and "promissory estoppel" were state law causes of action.
 
 
 17
 (Plaintiff's Reply Brief at 1).
 
 
 18
 If the above does represent the issue the plaintiff actually wants decided, it is fairly easy of resolution. The district court decision did not, as plaintiff suggests, hold that his fair representation claims were state causes of action. By the same token, plaintiff never plead a federal "promissory estoppel" theory. Before addressing these issues further, it is helpful to sort out just what the parties apparently agree to. Clearly, there is no issue raised on appeal as to the dismissal of NFS, so that issue can be laid to rest. Similarly, there is apparent agreement "that it was not a breach of duty to arbitrate plaintiff's claim as it did ... and ... not a breach of duty to decide not to appeal from the negative award." (District court opinion, May 16, 1988, app. 80).
 
 
 19
 The nub of this controversy seems to revolve around the "promissory estoppel" claim. If this was plead as a pendent state claim, then we conclude the state court decision would now be res judicata on this issue. In situations such as this, appellate courts view the matter between the parties as it exists at the time of the appellate decision. The fact that plaintiff claimed in state court that the "promise" actually created a contract, a contention with which the state court agreed, would not alter the res judicata effect of the state judgment. Insofar as plaintiff argues that he pled the "promissory estoppel" in federal court as a federal claim, the complaint he filed simply will not support this construction. Plaintiff's federal complaint specifically stated:
 
 
 20
 Plaintiff avers that defendant International [U]nion's duty and the local union's duty of fair representation extends to conduct during the negotiation [sic] of a collective bargaining agreement and encompasses misrepresentations to union members during the ratification process. Plaintiff also avers that pursuant to the rationale of Caterpillar v. Williams, --- U.S. ---- 96 L.Ed.2d 318 (1987) plaintiff['s] state law claims against defendant International [U]nion and defendant local union for tortious misrepresentation, promissory and equitable estoppel and intentional infliction of emotional distress are concurrent claims and are not preempted by federal labor law. The misrepresentations and promises made by the agents of the International [U]nion are not redressable in the grievance procedure contained in the new collective bargaining agreement and thus form the basis of independant [sic] state law claims.
 
 
 21
 (App. 12-13) (emphasis added).
 
 
 22
 Plaintiff's only remaining contention is that the district court erroneously concluded that the claim the union failed to fairly represent him during the time of the ratification of the new collective bargaining agreement was a state law claim. As we stated earlier, we reject that construction of the district court's opinion. The district court specifically concluded that "it was not a breach of the union's duty of fair representation for it to agree that the discharged workers should submit to arbitration rather than hold out for reinstatement" (App. 80). Although the district court did not elaborate on its reasons for reaching this conclusion, it is clear that it resolved this issue as part of plaintiff's section 301 claim. We hasten to add that we agree with this conclusion. A union does not breach its duty of fair representation when it makes a decision for the good of the entire union which may have the effect of disadvantaging some of its members. Here the union was in a difficult situation. The strike had been long and costly and the employer was talking decertification. It was imperative to resolve the strike. Submitting these discharges to arbitration for a "just cause" determination was an eminently reasonable solution to an impasse. It provided the plaintiff with the exact same protection he would have had if he had been discharged while the collective bargaining agreement was in force.
 
 
 23
 Even if we were to view plaintiff's complaint as stating a "federal" cause of action for promissory estoppel separate and apart from the pendent state claim, we would find no basis for a reversal. First, the res judicata or collateral estoppel effect of the state court judgment would be as binding on the federal claim as it would on the state claim. There simply has been a judicial determination that the unions fulfilled whatever promises they made. If plaintiff feels grieved by this ruling, his remedy is to appeal the state court decision. Second, we find the case authority relied upon by plaintiff to support his federal promissory estoppel theory to either be inapposite or contrary to the position urged by plaintiff. For example, Higgins cites Acri v. International Ass'n of Machinists, 781 F.2d 1393 (9th Cir.), cert. denied, 479 U.S. 816 (1986), in support of his position. Although the Ninth Circuit recognizes the equitable doctrine of estoppel as an alternative theory of recovery in suits by members against their unions,[5] the test for its application set forth in Acri cannot be met by Higgins. The court stated in Acri:
 
 
 24
 Although the duty of fair representation extends to misrepresentations during ratification, plaintiffs must establish a causal relationship between the alleged misrepresentations and their injury. In this context causation would be established by proof that (1) the vote to ratify would have been different had the misrepresentations not been made; and (2) that the company would have acceded to union demands had the vote been different.
 
 
 25
 Id. at 1397 (citations omitted).
 
 
 26
 Putting aside for the moment the fact that there arguably was no misrepresentation made at all here,[6] the plaintiff cannot meet the second prong of the Acri test. If anything is clear from this record, it is that NFS was not going to concede on the question of reinstating the discharged strikers. Indeed, that is the very reason why the union adopted the extraordinary measure of paying the discharged strikers from a fund created by a dues increase to the union members.
 
 
 27
 Plaintiff also relies on Hass v. Darigold Dairy Products Co., 751 F.2d 1096 (9th Cir.1985). In Hass, the plaintiff had been promised by a union official that if she switched to part-time employment she would not lose her seniority. Plaintiff later discovered she had lost her seniority and brought a state court action which was removed to federal court as an action arising under section 301. The inapplicability of Hass to the facts of the case at bar is best illustrated by language from a subsequent Ninth Circuit case. In Williams v. Caterpillar Tractor Co., 786 F.2d 928 (9th Cir.1986), aff'd, 482 U.S. (1987), the court discussed Hass and stated:
 
 
 28
 However, the decision in Hass does not afford a potential federal remedy to the Caterpillar employees. The Hass decision applied estoppel principles to a case already arising under Sec. 301 as it involved interpretation of a collective bargaining agreement. After holding that the subsequent agreement could not defeat the plaintiff's claim, we proceeded to determine whether the original collective bargaining agreement required reinstatement of the plaintiff's original seniority position. Id. at 1101. Her "seniority rights were grounded in the ... bargaining agreement." Id. at 1102. Unlike Hass, the Caterpillar employees' claims are not "grounded" in a collective bargaining agreement, amended or otherwise.
 
 
 29
 The Caterpillar plaintiffs may raise estoppel in one of two ways. First, the plaintiffs did raise estoppel in their complaint through a state law cause of action for fraudulent misrepresentation, claiming they detrimentally relied upon the alleged assurances of permanent employment. Second, estoppel may be raised as a shield to defeat Caterpillar's preemption argument that the precedent contracts were merged into the collective bargaining agreement. In neither instance is the estoppel issue raised in the context of a pending Sec. 301 action, as it was in Hass. The plaintiffs' claims simply do not arise under Sec. 301.
 
 
 30
 Id. at 937 n. 7.
 
 
 31
 It is clear that, as in Caterpillar, Higgins' rights are not grounded in the collective bargaining agreement since none existed at the time the promise was made to Higgins. Higgins had it right the first time. The action by the union created a new and independent enforceable contract which could be sued upon in state court. This is exactly what Higgins did. The fact that he was dissatisfied with the outcome does not convert his cause of action to one arising under section 301.[7]
 
 
 32
 AFFIRMED.
 
 
 
 [1]
 Since there was no collective bargaining agreement in effect, it was necessary to agree to the standard to be applied by the arbitrator
 
 
 [2]
 The other six arbitration hearings were held subsequently, and resulted in two employees being reinstated without pay and four discharges being upheld
 
 
 [3]
 The arbitrator found that there was just cause for the discharge predicated upon his conclusion that:
 The company's decision to discharge the grievant was based principally upon three alleged incidents of misconduct by the grievant: (1) the tearing off of a directional signal from a Murray Guard Service bus at the exit from the plant facility on May 29, 1985; (2) threatening conduct towards supervisor Furman Bryant on June 10, 1985; and (3) the intentional driving of the grievant's vehicle against the rear of the moving Murray Guard Service bus on June 12, 1985.
 
 
 [4]
 The exact language used by the district judge is as follows:
 However, plaintiff's claim that the union broke its promise to provide his wages until age 62 if his arbitration proved unsuccessful is not necessarily pre-empted by labor law. Nor is it susceptible to summary disposition. Summary judgment on this claim is hereby DENIED and plaintiff's prayer for punitive damages and his jury demand are not dismissed at this time.
 (App. 80).
 
 
 [5]
 This circuit has neither adopted nor rejected the equitable estoppel theory discussed in Acri, and since we find the doctrine to be inapplicable on the facts of this case, we elect to save for another day the consideration of this theory in the context of section 301 actions
 
 
 [6]
 In Acri the union representatives told the membership an outright lie in order to induce contract ratification. Here, the union made a promise which it kept, and the only issue is whether it subsequently broke that promise. The state court answered this question "no."
 
 
 [7]
 Any cause of action arising from the contract created by the union action in voting to continue Higgins' salary and benefits clearly would not be the type that would be subject to section 301 preemption. See Caterpillar, Inc. v. Williams, 482 U.S. 386 (1987)