ECODYNE CORPORATION, Plaintiff,

v.

**GUTHRIE NORTH AMERICA, INC., Defendant.**

No. 88 C 2647.

United States District Court, N.D. Illinois, E.D.

Aug. 10, 1989.

Roger L. Longtin, Monica L. Thompson, Keck, Mahin & Cate, Chicago, Ill., for plaintiff.

John J. Cassidy, Jr., Edward A. Cohen, Susan G. Feingold, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., for defendant.

## ORDER

BUA, District Judge.

Plaintiff Ecodyne Corporation ("Ecodyne") filed the instant action claiming that defendant Guthrie North America, Inc. ("Guthrie") defrauded Ecodyne in connection with a securities transaction. Ecodyne complains that Guthrie failed to disclose certain material facts in connection with Ecodyne's purchase of all the stock of Guthrie's former wholly-owned subsidiary, Water Refining Co., Inc. ("WRC"). Specifically, Ecodyne claims that Guthrie failed to fully disclose information regarding a design defect in one of the products manufactured by WRC. Ecodyne's amended complaint contains six counts. Counts I and II allege violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1982); § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a) (1982); and Rule 10b–5 of the Securities and Exchange Commission, 17 C.F.R. § 240.10b–5 (1986). The remaining counts assert state law claims for consumer fraud, common law fraud, and breach of contract.

This order concerns Guthrie's motion for partial summary judgment. Guthrie argues the undisputed facts establish that Ecodyne's securities law claims are barred by the applicable three-year statute of limitations. Therefore, Guthrie has asked the court to enter summary judgment in its favor on Counts I and II and to dismiss the remaining pendent claims for lack of federal jurisdiction. For the reasons stated herein, Guthrie's motion is granted.

## FACTS

In early 1983, Ecodyne entered into negotiations with Guthrie for the purchase of all the stock of WRC. WRC was a subsidiary of Guthrie in the business of manufacturing and selling water softener units, among other products. Prior to its purchase of WRC, Ecodyne conducted a "due diligence" investigation of WRC's operations. Ecodyne's due diligence investigatory team was led by Ecodyne's controller, Fred Kemph. As part of his investigation, Kemph looked into matters relating to WRC's insurance, product and warranty

claims. Kemph specifically inquired about product defects to Steve Davis, WRC's Director of Engineering and Manufacturing. Davis discussed with Kemph an alleged defect in the 110–volt water softener manufactured and sold by WRC. Davis told Kemph that several insurance claims and a lawsuit had been filed against WRC claiming that the 110–volt water softener had caused fire damage. Davis opined that the lawsuit was merely a "nuisance" action and there was no real problem with the 110–volt unit.

Kemph believed Davis' statement that there was no real problem with the 110–volt water softener for several reasons. First, he had reviewed auditing statements of WRC prepared by the accounting firm of Deloit, Haskins & Sells. These statements did not contain any specific reserve for fire damage caused by product defects. Second, Kemph was familiar with a similar product manufactured by Ecodyne which he believed could not cause fire damage. Kemph's opinion in this regard was buttressed by statements from Ecodyne's technical personnel, who assured Kemph that Ecodyne's water softener could not cause residential fires.[1] Finally, Kemph stated he believed Davis because none of the WRC documents or reports which he reviewed indicated that the fire damage claims against WRC had a common cause.

After Kemph's team completed its investigation, Ecodyne decided to purchase WRC from Guthrie. On April 14, 1983, Ecodyne entered into a written agreement with Guthrie under which Ecodyne purchased all of the outstanding shares of WRC stock for $2,700,000. Attached to the agreement was a written disclosure by Guthrie of all the product insurance claims and lawsuits pending against WRC as of January 10, 1983. The list identified six of the twelve insurance claims and one of the three lawsuits as relating to fire damage allegedly caused by product defects. After the transaction was consummated, WRC became a wholly-owned subsidiary of Ecodyne.

Sometime in the early half of 1984, F. Stuart Mitchell, then President of Ecodyne, inquired about the fire problems that WRC had experienced with its 110–volt residential water softeners. Mitchell asked Steve Davis, who had been promoted as Acting General Manager of WRC, to prepare a memo addressing the history and status of the product defect matter. Davis was the most knowledgeable person at WRC with respect to the 110–volt water softener. In response to Mitchell's request, Davis sent Mitchell a memo dated July 18, 1984, discussing the fire problem. Davis' memo informed Mitchell that the problem was due to "catastrophic [solenoid] coil failures" in the 110–volt water softeners. Davis' memo indicated that the problem arose in approximately 1972 and that in the mid-1970s, WRC developed an asbestos cover which had "100% solved the problem" when placed over the solenoid coil. With respect to whether the cover was fitted to all previously manufactured units already in the field, Davis stated in his memo:

> ... it was ... discussed at WRC about the advisability of notifying all dealers of the potential danger involved and to offer them this particular cover which they could add to those given units in the field. At this moment, I can't factually tell you if a memo went out to the field or not. Some think that it did but yet we can't find a record showing that this was done.

Davis also stated in the memo that the coil failures "continue to plague [WRC] today" and estimated their occurrence at about "2–4 per year." He concluded the memo by stating:

> As far as the future, we have no reason to believe that our track record of failures should improve—in fact it may get worse. What we must be concerned about is potential loss of life which has not occurred.

Shortly after receiving Davis' memo, Mitchell asked Dr. Duane Nowlin, Ecodyne's Director of Technical Services, to

---

1. Kemph and Ecodyne's technical staff held this opinion despite knowing that a recent lawsuit alleging fire damage resulting from Ecodyne's water softener had been successful.

investigate and report on the solenoid defect problem. Nowlin then met with his assistant, Ray Walton, to discuss the concerns raised in Davis' July 18 memo to Mitchell. At the time, Nowlin was aware of at least one claim pending against WRC relating to a fire allegedly caused by a WRC water softener. Walton and Nowlin discussed the need to find out the extent of the fire problem, including how many fires there had been and whether the fire problem had been solved.

Nowlin then contacted Davis and asked him for more information on the fire problem. Davis told Nowlin the problem involved overheating of the solenoid coils on WRC's 110–volt water softeners manufactured in the early 1970s. Davis explained that the overheating caused a flare-up, a ball of fire, to appear atop the solenoid. Davis also informed Nowlin that WRC had implemented various changes in the product in an attempt to solve the fire problem. These corrective measures were listed in a memo dated January 10, 1978, from Davis to former WRC President D. Bower. The 1978 memo was attached to Davis' July 18, 1984 memo to Mitchell. Davis told Nowlin that the last corrective step taken was the application of an asbestos cover which solved the fire damage problem in 110–volt units by containing, although not eliminating, the fire. However, Davis could not definitively tell Nowlin whether all the dealers had been notified of the fire problem or had equipped their 110–volt units with the asbestos cover. In addition, Davis had no knowledge that any notification of the defect was given to consumers who had purchased the units prior to the development of the asbestos cover. Therefore, Nowlin and Walton remained concerned about whether the fire problem had been solved with respect to 110–volt units already in commerce.

Pursuant to Nowlin's request, Davis gathered more information on the fire problem. He requested any documents relating to the problem from all the WRC department heads. Among the documents he received as a result of his requests was a six-page list identifying forty-seven fires that had been caused from 1973 to 1977 by 110–volt residential water softeners manufactured by WRC. Davis then sent all the information he had received to Nowlin, and Nowlin turned it over to Walton for analysis. On August 8, 1984, Davis sent some additional information on the fire problem to Walton. Included in that material was a two-page document on WRC stationery dated June 21, 1977, and entitled, "Fire related insurance claims for losses." The June 21 memo stated:

> Due to increased consumer awareness of product liability, greater awards by juries, and ever increasing litigation involving manufacturers, ... greater dollar claims can be anticipated.

> Probable claims based on history will be 10 in 1977 with average claim of $4136.00.

> Future years will probably see 8 or 10 claims with dollar amounts keeping pace at same rate of inflation.

On August 16, 1984, Walton drafted a memo to Nowlin attaching a graph which he had prepared from the information provided by Davis. The graph charted the number of fire damage claims arising during the years from 1973 to 1984. The graph showed a high of sixteen claims made in 1976, a low of zero claims made in 1979, and indicated that three claims were made in 1982, one in 1983, and one in 1984. Walton's accompanying memo stated:

> The attached graph illustrates the best information that can be gleaned from the data supplied by S. Davis. I don't think the information is complete but it is probably the best that can be done with what we have. All units that are in the defective population were built prior to 1976, with the total population being about 350,000.

Walton hand delivered the memo and graph, as well as all the documents he used to prepare them, to Nowlin. Nowlin and Walton then had further discussion related to the fire damage problem.

In November 1984, a fire damage claim was made against WRC and reported to Ecodyne. In April 1985, another fire damage claim was asserted against WRC and

came to Nowlin's attention. Nowlin then investigated whether any other fire damage claims were recently made against WRC. Upon discovering the existence of the November 1984 claim, Nowlin sought the advice of Ecodyne's attorneys. They advised Nowlin to notify the Consumer Product Safety Commission of the WRC product defect, which Ecodyne later discovered Guthrie had never done. In June 1985, Ecodyne's attorneys contacted Guthrie and demanded indemnification for all costs and expenses incurred by Ecodyne as a result of the WRC product defect. Guthrie refused to indemnify Ecodyne.

On March 28, 1988, Ecodyne filed its complaint against Guthrie, which was subsequently amended on June 22, 1989. The amended complaint alleges that Guthrie defrauded Ecodyne by failing to disclose the fact that fires had resulted from a defect in WRC's 110–volt water softener and by failing to disclose that WRC was subject to continuing liability resulting from its failure to repair or recall the defective products which had been sold to consumers. Ecodyne also alleges that Guthrie made various misrepresentations concerning the accuracy of WRC's financial statements and the strength of WRC's financial condition. These misrepresentations are all related to Guthrie's alleged failure to make full disclosure concerning WRC's product defect problem.

## DISCUSSION

I. *Ecodyne's Federal Securities Law Claims*

■ The parties agree that the statute of limitations applicable to Ecodyne's securities law claims is three years. *See Teamsters Local 282 Pension Trust Fund v. Angelos,* 815 F.2d 452, 455 (7th Cir.1987). Their dispute concerns when the statute of limitations period began to run. Guthrie contends that the limitations period began to run on April 14, 1983, the date the sale of WRC was completed. In support of its position, Guthrie argues that the statute of limitations period generally begins to run when plaintiff's cause of action arises, and a cause of action arises under the anti-

fraud provisions of the federal securities laws on the date the sale of the securities is completed. *See Suslick v. Rothschild Securities Corp.,* 741 F.2d 1000, 1005 (7th Cir.1984). Guthrie maintains that since Ecodyne did not file the instant action until almost five years after its purchase of the WRC stock, its federal securities claims are time-barred.

Ecodyne claims, however, that under the doctrine of equitable tolling, the statute of limitations period did not begin to run until after March 28, 1985. In a fraud case, the doctrine of equitable tolling operates to delay the start of the statute of limitations period in two situations.

> First, the doctrine will toll the running of the statute of limitations where the fraud goes undiscovered even though the defendant does nothing to conceal it. The plaintiff, however, must exercise due diligence in attempting to uncover the fraud. In the second situation in which equitable tolling applies, the fraud goes undiscovered because the defendant has taken positive steps after commission of the fraud to keep it concealed. This type of fraudulent concealment tolls the limitations period until actual discovery by the plaintiff.

*Suslick,* 741 F.2d at 1004 (*citing Tomera v. Galt,* 511 F.2d 504, 510 (7th Cir.1975)). *See also Teamsters,* 815 F.2d at 456 & n. 4. Ecodyne argues that equitable tolling applies in the instant case because the facts in this case fit both scenarios described in *Suslick.* First, Ecodyne claims that this case presents the unconcealed, undisclosed fraud situation. Specifically, Ecodyne maintains that it did not discover all of the facts necessary to assert its federal securities fraud claims until sometime after March 28, 1985. Applying equitable tolling, Ecodyne argues that the statute of limitations was tolled as to those claims until the date the fraud was discovered, making its securities claims timely filed.

The court finds, however, that this case does not fit the first situation described in *Suslick.* The primary prerequisite for application of the equitable tolling doctrine in the unconcealed, undiscovered fraud con-

text is due diligence. Where the defendant has not taken positive steps to conceal the fraud after it has been committed, the doctrine of equitable tolling applies only if plaintiff shows that he remained unaware of the fraud without any fault or want of diligence on his part. *Teamsters*, 815 F.2d at 456 (*citing Hupp v. Gray*, 500 F.2d 993, 996 (7th Cir.1974)); *Suslick*, 741 F.2d at 1004. The plaintiff has the burden of showing that he exercised reasonable care and diligence in seeking to learn the facts which would disclose the fraud. *Id.*

In the instant case, Ecodyne failed to exercise due diligence in seeking to discover Guthrie's alleged fraud. All of Ecodyne's fraud allegations essentially complain that Guthrie failed to make complete and accurate disclosure of the WRC product defect and the continuing fire problem. While Ecodyne may have known little about the fire problem prior to its purchase of WRC on April 14, 1983, Ecodyne had a good deal of information about the problem as of August 1984. By that time, Mitchell, Ecodyne's President, had received the July 18, 1984 memo from Davis discussing in some detail the nature, history, and status of the problem. That memo clearly indicated that the fire problem had not been completely eradicated as to water softeners out in commerce. In fact, Davis expressed great concern to Mitchell about WRC's future liability resulting from fires occurring in units in the field.

When Nowlin and Walton looked into the fire problem at Mitchell's direction in late August of 1984, they also discovered information indicating that the fire problem was an ongoing concern at WRC. They discovered that at least forty-seven fires had occurred from 1973 to 1977, that at least eleven fires had occurred from 1978 to August 1984, and that at least two of the fires had occurred after Ecodyne's purchase of WRC. Nowlin and Walton learned that the population of defective

water softeners was 350,000. They found no documentation or other evidence indicating that the asbestos covers had reached all of the dealers and customers who possessed these defective products.

Arguably, Ecodyne's possession of all this information in August 1984 was sufficient to put it on notice of both the nature of WRC's fire problem and the fact that the problem was a continuing concern of WRC. Therefore, Ecodyne had effectively discovered Guthrie's alleged fraud as of August 1984, triggering the start of the limitations period.[2] Even assuming, however, that Ecodyne is correct in arguing that the information it possessed in August 1984 was insufficient to amount to "discovery" of Guthrie's fraud, the information was at least sufficient to permit discovery of the fraud had Ecodyne exercised due diligence. Diligent investigation of the WRC product defect problem would have uncovered any additional facts which Ecodyne contends it needed to assert its securities fraud claims, including Guthrie's decision not to report the defect to the Consumer Product Safety Commission and the existence of numerous units in commerce which had not been fitted with asbestos covers. Instead of diligently investigating the extent to which the fire problem had been rectified as to units in the field, Ecodyne remained passive, blindly believing that Guthrie had taken adequate measures to solve the problem. Given these circumstances, this case does not present the type of unconcealed, undisclosed fraud described in *Suslick* to which the doctrine of equitable tolling applies.

Ecodyne also argues that this case fits the second situation identified in *Suslick* as appropriate for application of equitable tolling—the fraudulent concealment context. Specifically, Ecodyne maintains that Guthrie took positive steps to conceal the fraud, and that these acts of concealment tolled the statute of limitations until Ecodyne ac-

---

**2.** Ecodyne claims that it did not discover Guthrie's fraud until April or May of 1985. However, the only additional information Ecodyne received between August 1984 and April or May of 1985 was the existence of two more fire claims against WRC. It makes no sense to maintain that knowledge of these two additional fire claims somehow allowed Ecodyne to "discover" the fraud, since Ecodyne already knew of almost sixty fire claims which had been made against WRC, five of which were made from 1982 to 1984.

tually discovered the fraud in April or May of 1985. For equitable tolling to apply in the fraudulent concealment situation, however, the defendant's acts of concealment must occur *after* the commission of the fraud. *Teamsters,* 815 F.2d at 456 n. 4; *Suslick,* 741 F.2d at 1004. Ecodyne fails to identify any acts of concealment on the part of Guthrie after the commission of the fraud. The only act which Ecodyne alleges Guthrie committed after the fraud was its denial of any wrongdoing or liability in connection with the WRC fire problem. This denial is not sufficient to constitute an affirmative act of concealment. *United National Records, Inc. v. MCA, Inc.,* 609 F.Supp. 33, 36 (N.D.Ill.1984). Therefore, the limitations period was not tolled by virtue of any fraudulent concealment on the part of Guthrie.

Given the extent of Ecodyne's knowledge of the fire problem as of August 1984, as well as the fact that Guthrie did not take any positive steps to conceal its alleged fraud after Ecodyne's purchase of WRC, the statute of limitations on Ecodyne's securities fraud claims was not tolled after August 1984.[3] The three-year statute of limitations period began to run no later than August 1984, and expired more than a half-year before Ecodyne's complaint was filed in March of 1988. Therefore, Ecodyne's securities claims are barred by the applicable statute of limitations. Guthrie is entitled to summary judgment on Counts I and II.

II. *Ecodyne's Pendent State Claims*

 Where federal claims are disposed of before trial, and all that remains of plaintiff's action is pendent state claims, the state claims should be dismissed without prejudice almost as a matter of course. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Baltimore Orioles, Inc. v. Major League Baseball Players Association,* 805 F.2d 663, 682 (7th Cir.1986), *cert. denied,* 480 U.S. 941, 107 S.Ct. 1593, 94

L.Ed.2d 782 (1987). The court finds that the instant case presents no special circumstances which would indicate that retaining jurisdiction over Ecodyne's pendent claims is appropriate. Accordingly, Counts III–VI are dismissed without prejudice.

### CONCLUSION

For the foregoing reasons, Guthrie's motion for summary judgment on Counts I and II is granted; Counts III–VI are dismissed without prejudice for lack of federal jurisdiction.

IT IS SO ORDERED.

---

**3.** While equitable tolling may apply prior to August 1984, the court need not address that issue to resolve this motion.