Dan SWARTZ, Plaintiff,

v.

Jerry SCHAUB, et al., Defendants.

No. 92 C 1623.

United States District Court,
N.D. Illinois, E.D.

July 12, 1993.

---

Robert J. Oliver, Thomas E. Greenwald, John Rearden, Jr., Oliver, Close, Worden & Greenwald, Rockford, IL, for plaintiff.

Claude B. Kahn, Kipnis, Kahn & Bruggeman, Ltd., Chicago, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

From the very beginning this Court has been troubled as to whether federal jurisdiction exists over this action. Plaintiff Dan Swartz ("Swartz") alleges several claims stemming from asserted misrepresentations by defendants in their sale to Swartz of a 1965 Porsche Cabriolet for $50,000—and of course the jurisdictional amount for any diversity-based claims is *more* than $50,000. By definition any straight breach of contract claim by Swartz (that is, a claim that the car was worth less than Swartz paid for it) could not meet that level of dispute. And absent any federal-question claim, each of Swartz'

state-law claims would have to confront that same problem of the jurisdictional amount in controversy.[1]

In addition to his several state law claims, Swartz has also included as his Count IV a purported federal-question claim—one under Lanham Act § 43(a), 15 U.S.C. § 1125(a) ("Section 43(a)")—for which no minimum jurisdictional amount need be in controversy. If that claim were to stand up, the several state law claims could survive irrespective of whether they topped the $50,000 figure—that has been established by the enactment of the supplemental jurisdiction statute, 28 U.S.C. § 1367 ("Section 1367"). But Opinion I at 4 also briefly characterized the Section 43(a) claim as problematic, and it too will be addressed a bit later.

Two of Swartz' original six counts have gone the way of all flesh via their dismissal in this Court's April 23, 1993 memorandum opinion and order ("Opinion II," 818 F.Supp. 1214): Count III (advanced under the Illinois Consumer Fraud and Deceptive Business Practices Act) and Count V (purporting to sound in negligent misrepresentation). Because the final pretrial order ("FPTO") then tendered by the parties and entered by this Court on June 4, 1993 disclosed facts that caused this Court to have a continuing concern in subject matter jurisdictional terms, it put the parties to briefing the issues on that score. At this point the briefing on the Lanham Act claim has been completed, and the entire matter is now ready for disposition.

■ First as to the Count IV Lanham Act claim, Opinion I's original intuitive characterization of that as "quite a strange reading" has been borne out in spades by the parties' memoranda and this Court's own research. Some of the case law (led by decisions in the

---

1. On March 10, 1992, within a week after the Complaint was filed, this Court issued a short unpublished memorandum opinion and order ("Opinion I") identifying a whole series of concerns as to jurisdiction. It concluded by stating (Opinion I at 4–5):

> In summary, any potential for retention of this action as a federal-court lawsuit is dependent on a congeries of issues that appear to require early resolution. One problem with such a

prospect is that more money can be chewed up in lawyers' fees in resolving those questions than would appear to make sense in light of the amount that is at issue between the parties. It might seem the better part of valor to consider litigating this dispute in a state court of general jurisdiction, where most of the problems that have been identified in this opinion would vanish.

Second Circuit, which originally marked out its position in *Colligan v. Activities Club of New York,* 442 F.2d 686 (2d Cir.1971)) would limit the availability of Section 43(a) to members of a "purely commercial class" and would expressly render the statute unavailable to consumer plaintiffs. But quite apart from those restrictive readings, even the numerous courts that give the statute a much broader scope do not support what Swartz attempts here.

Section 43(a) has often been referred to in shorthand terms as having enacted a federal common law of unfair *competition.* Our own Court of Appeals has engaged in a thoughtful survey of *Colligan* and of the case law trending in a different direction in *Dovenmuehle v. Gilldorn Mortgage Midw. Corp.,* 871 F.2d 697, 699–700 (7th Cir.1989) (citations omitted):

Typically, plaintiffs suing under § 43(a) are business competitors claiming to be injured as a result of false advertising. The question of how broadly the Lanham Act extends beyond business competitors, however, is somewhat uncertain.

In *Colligan v. Activities Club of New York, Ltd.,* 442 F.2d 686, 692 (2d Cir.), *cert. denied,* 404 U.S. 1004, 92 S.Ct. 559, 30 L.Ed.2d 557 (1971), the Second Circuit held that standing under § 43(a) is limited to commercial parties, thereby rejecting claims by consumers under the Act. Nonetheless, within the class of commercial parties, the Second Circuit has made clear that the class of parties with standing in § 43(a) is quite broad. A party need not be in direct competition with a defendant to challenge a defendant's practices under the Act. All a commercial party needs to bring suit under the Act is a "reasonable interest to be protected" against activities that violate the Act.

Other circuits have also agreed that the question of standing under § 43(a) "turns on whether the party 'has a reasonable interest to be protected against' " conduct violating the Act. There has been some criticism of language in the Second Circuit's *Colligan* decision limiting standing to members of a "purely commercial class." Cases criticizing *Colligan* have reasoned that limiting standing under § 43(a) to members of a "purely commercial class" is too narrow a reading of the Act's broad language that allows a person "who believes that he is or is likely to be damaged" by the defendant's activities to sue. Whether the plaintiff's claims are viewed under the Second Circuit's authority limiting standing to commercial parties or under a more expansive approach, however, plaintiffs in the present case have failed to establish "a reasonable interest to be protected...."

That extended statement in *Dovenmuehle* was followed by an analysis of the facts before the court that made it plain that a plaintiff's "reasonable interest" had to be *commercial* in nature—whether competitive (directly or indirectly) with defendants, or in the operation of some commercial activity, or to protect some other actual or anticipated commercial interest. Even though that set of alternatives may not exhaust the universe, it is crystal-clear that Lanham Act coverage requires a potential injury in commerce in a very different sense from that advanced by Swartz here. Essentially Swartz would seek to federalize every contract for the sale of goods in which a buyer charges the seller with misrepresentation, and the law simply does not support that in a one-to-one transaction such as that involved here. There is no genuine issue of material fact on that score (that is, Swartz cannot win even on his own version of the facts), and defendants are therefore entitled to a judgment as a matter of law on Count IV.

■ Thus lacking a federal-question anchor, Swartz' entitlement to remain in this District Court must depend on the existence of the requisite amount in controversy to support diversity jurisdiction. Supplemental jurisdiction under Section 1367 is not enough, for by its very nature it must be supplemental to *some* claim over which jurisdiction exists (and for that reason the Count VI breach of contract claim, which clearly involves less than $50,000, may be ignored).

Count I sounds in rescission, as to which the repayment of the $50,000 purchase price plus reimbursement of other expenses incurred by Swartz would get the amount over

the jurisdictional watershed if the claim were viable. But as the ensuing discussion reflects, Swartz' problem in invoking that remedy is one of timeliness.

■ For anyone who seeks to rescind a contract on grounds of fraud in this state, time is clearly of the essence. Illinois law has long recognized that the victim of contract fraud who wishes to rescind that contract must not only announce his or her election promptly but must *act* on that intention with like promptness. Six decades ago that doctrine was announced as already firmly established in these terms in *Kanter v. Ksander,* 344 Ill. 408, 415, 176 N.E. 289, 291 (1931) (emphasis added and citations omitted):

> A party to a contract who desires to rescind for fraud must make his election to do so promptly after learning of the fraud. *He must announce his purpose and adhere to it.*

Three decades ago, just before it repeated that doctrine in reliance on *Kanter,* the decision in *Schoenbrod v. Rosenthal,* 36 Ill. App.2d 112, 120, 183 N.E.2d 188, 192 (1st Dist.1962) expanded on the principles underlying the doctrine:

> In cases based on fraud far greater emphasis is placed on the delay in asserting the claim than on a change of circumstances, for an unreasonable lapse of time between discovering the supposed fraud and bringing the suit is of itself prejudicial to the party charged with fraud. The very nature of the charge calls for prompt action. An unexplained delay raises an immediate doubt as to a plaintiff's right to ask the intervention of a court of equity which is an appeal to justice and good conscience. One who requests the help of a court of equity must be of good faith and must be diligent in prosecuting his claim. The natural reaction of a person who has been defrauded is to cry out in protest and to move with alacrity in seeking redress. When he does neither, his claim and his motives are suspect.

To be sure, many of the cases that have rejected a rescission remedy because they found a party's delay to be unreasonable as a matter of law have involved delays longer than that attributable to Swartz here (see, e.g., cases cited in *Schoenbrod, id.*). But the seminal decision in *Kanter* itself refused rescissionary relief due to plaintiff's delay of less than 11 months, while much more recently an elapsed period of *six* months between the date of discovery of the alleged fraud and the assertion of a rescission claim in litigation caused the rejection of that claim in *Madison Assoc. v. Bass,* 158 Ill.App.3d 526, 540, 110 Ill.Dec. 513, 523, 511 N.E.2d 690, 700 (1st Dist.1987). And as the ensuing review of the facts reflects, Swartz admittedly did not file this lawsuit for fully *nine* months after he had learned of the alleged fraud.

Swartz' Rescission Mem. 5 acknowledges that Swartz learned of the problems constituting the alleged fraud in June 1991. Swartz contends that he then demanded rescission quickly enough in August 1991—but in fact that demand took the form of an August 20 letter to defendants that offered them three options:

1. the return of the car for refund of the $50,000 purchase price (that is, a true rescission);

2. the restoration of the car by a mutually-agreed-on facility at defendants' expense; or

3. a cash settlement of $7,500.

Swartz' exhibits to his Rescission Memorandum then reflect this:

1. On September 3, 1991 Swartz' lawyer sent a letter to defendants (a) complaining of the lack of any response to the August letter, (b) stating that he was "prepared to file suit against you based on the misrepresentation," (c) asserting that such misrepresentation "provides a legal remedy of recision of the contract, or in the alternative, for damages in an amount necessary to bring the car up to its represented condition" and (d) concluding with this warning:

> If you wish to avoid suit please contact me immediately, either directly or my [sic] attorney, otherwise I will proceed to file the summons and complaint.

2. More than 45 days later (Swartz having in the meantime having received a rejec-

tion letter dated September 23) Swartz' lawyer sent an October 21 letter reiterating that Swartz "certainly has the right to either rescind the contract or to bring suit for the damages he sustained" and concluding by saying "if you are not going to proceed to accept Mr. Swartz' offer, I will proceed to start the lawsuit."

Yet this action was not brought until March 5, 1992—fully nine months after Swartz had learned of the asserted misrepresentation, six and one-half months after Swartz' lawyer had originally set out the available options (including rescission) and fully six months after Swartz' lawyer had again said that he was ready to sue for rescission or damages.

■ That sequence of events disentitles Swartz to maintain an action for rescission. Again it is not enough under Illinois law simply to *say* that you are ready to bring suit for rescission—instead you must *act* on that kind of statement and do it promptly. Such cases as *Madison Assoc.* (and *Kanter* as well) confirm that Swartz' delayed action here was untimely, though of course he was not barred from suing for damages.

With Counts III and V having gone by the boards in Opinion II, with Counts I and IV having succumbed in this opinion and with Count VI for breach of contract concededly falling below $50,000, that leaves only Count II as a potentially viable diversity claim. But the factual development of the dispute as reflected in the FPTO does not support any reasonable prospect that the components of that claim (including any potential punitive damages for the claimed misrepresentation) would exceed $50,000 either, so that final claim by Swartz also falls short of the jurisdictional amount.

In sum, Swartz' only asserted federal-question claim (the one advanced under the Lanham Act) fails to state a cause of action, while each of the surviving state-law claims falls short of the amount needed for subject matter jurisdiction. Accordingly Count IV is dismissed, while each of Counts I, II and VI are dismissed without prejudice to their being refiled in a state court of competent jurisdiction (see *United Mine Workers v.*

*Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966)).