The **PEDRE COMPANY, INC.,** the Pedre Company Profit Sharing Plan, and R. Peter Gunshor, Plaintiffs,

v.

Lee **ROBINS,** Stanley A. Deitch, CPI Associates, Inc., Windsor Associates, Emerson F. Markham, Martin I. Blaustein and Conceptual Planning, Inc., Defendants.

Lee **ROBINS,** Stanley A. Deitch, CPI Associates, Inc., Windsor Associates, and Conceptual Planning, Inc., Third–Party Plaintiffs,

v.

Steven **BOUGHNER,** Third– Party Defendant.

No. 94 CIV. 3032(JSR).

United States District Court, S.D. New York.

Dec. 15, 1997.

**236**

Elliot I. Miller, Southport, CT, for Pedre Co., Inc., Pedre Co. Profit Sharing Plan, R. Peter Gunshor.

Andrew Irving, New York, NY, for Robins, Deitch, CPI, Windsor, Conceptional Planning.

Christopher Houlihan, New York, NY, for Blaustein.

Francis a Carling, New York, NY, for Markham.

### MEMORANDUM ORDER

RAKOFF, District Judge.

This is an action by a Profit Sharing Plan and its trustee alleging breach of fiduciary duty under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA") as well as various claims under New York State law. Following discovery, defendants Robins, Deitch, CPI, Windsor Associates, and Conceptual Planning ("the Robins defendants") jointly moved for summary judgment. Separate motions for summary judgment were filed by defendants Markham and Blaustein.[1]

The task of evaluating plaintiffs' response to these various motions was rendered somewhat difficult by plaintiffs' failure to comply with Rule 56.1 of the Civil Rules of the Southern District of New York. Indeed, what plaintiffs submitted as their Statement of Undisputed Facts under that Rule not only lacked the requisite citations to the record but also consisted, for the most part, not of a statement of facts at all, but of a series of questions. Similarly, the "Preliminary Statement of Facts and Prior Proceedings" in Plaintiffs' Memorandum of Law submitted in opposition to defendants' motions never once cites to the record and abounds in non-factual conclusory statements. Nonetheless, on the basis of the Court's own review of the underlying record, as well as plaintiffs' clarifications at oral argument of the motions, the following facts, either undisputed or taken most favorably to plaintiffs, may be gleaned.

Sometime around June, 1982, plaintiff Gunshor, in his capacity as trustee of the Pedre Company Profit Sharing Plan ("the Plan"), an ERISA qualified plan, accepted a proposal from defendant Robins by which the Plan would receive 15% of the net proceeds of a large "wraparound" mortgage in return for the Plan's taking legal ownership

---

1. Blaustein also sought summary judgment in his favor on his claim for indemnification by the Robins defendants, as well as dismissal of the cross-claims asserted against him by the Robins defendants.

of the mortgage and thereby providing certain tax benefits to the owners of the remaining 85% of the equity through derivative use of the Plan's tax exempt status. In execution of this agreement, the Plan, at the closing later that same month, became legal holder of a nonrecourse wraparound mortgage on a commercial real estate property that was already subject to underlying nonrecourse mortgages held by Sheridan Associates, a limited partnership Robins had helped to assemble. Simultaneously, the Plan entered into a Participation Agreement with Markham Associates, a partnership of Robins and other defendants, pursuant to which Markham Associates would receive 85% of the equity in the wraparound mortgage and the Plan would receive 15%. The net result was that, as a result of the legal ownership of the wraparound mortgage by a tax-exempt entity, certain tax benefits were created that effectively flowed through to the owners of the 85% equity; and in return the Plan received a 15% equity interest without having to expend any funds or put its capital at risk. Robins assured Gunshor that this tax avoidance scheme was proper and legal.

Robins subsequently proposed, and Gunshor subsequently accepted on behalf of the Plan, three similar agreements involving different real estate properties and differently-named partnerships but essentially the same terms and players.

In all four cases, the periodic mortgage payments by the limited partnerships were deposited in checking accounts in the Plan's name as holder of the wraparound mortgages, with the disbursement of funds from those accounts being subject to the applicable Participation Agreements. Checks were written on each such account to make required payments to the non-wraparound mortgagees and to deposit net balances in Dreyfus Liquid Assets accounts. Robins and defendant Deitch instructed Gunshor as to whom to make out these checks and for how much, and sometimes prepared the checks for his signature.

In the late 1980's, the parties to the arrangements began to fear that, because of declining real estate prices, the underlying properties might not be sold and the full benefits of the arrangements not realized. Accordingly, Robins proposed, and Gunshor accepted, that the Plan would agree to reductions in the amounts owed on the mortgages by the owners of the underlying properties in order to enable them to sell the properties at a profit. Negotiations with the owners of the underlying properties for these reductions was undertaken by Robins and Deitch, with Gunshor agreeing to each of the reductions that Robins and Deitch proposed.

The reductions resulted in correlative reductions in the net proceeds anticipated from the arrangements, but they also facilitated the sales of the underlying properties, which occurred between August 1986 and September, 1991. After the underlying properties were sold, the net proceeds and other remaining funds, representing the equity in the wraparound mortgages, were distributed pursuant to the Participation Agreements, with 15% of the proceeds going to the Plan and 85% going to the Robins-created partnership. The Plan received a total of $234,-000 in proceeds, on an investment of zero dollars.

In 1993, the Plan was notified that the Internal Revenue Service was investigating whether the foregoing arrangements violated various provisions of ERISA. The IRS raised the possibility that, if such violations had in fact occurred, the Plan might not only owe substantial taxes but also might lose its qualification as an ERISA plan. In response, the Plan vigorously maintained that no violations had occurred, but also made the fallback argument that any arguable violations were exclusively the fault of Robins and his associates. *See* Robins Defs. Exh. 55 (Letter of Elliot I. Miller, Esq. to the IRS, dated January 6, 1994).

In the end, the IRS abandoned any contention of ERISA violations, but did assess the Plan $54,668 in taxes on the ground that the $234,000 in proceeds that the Plan had realized on these arrangements was "unrelated business income" subject to tax. After paying these taxes, the Plan filed this suit in April, 1994, alleging that Robins and his co-defendants were liable not only for reimbursement of these taxes and of the Plan's costs of defending against the IRS investiga-

tion, but also for return of defendants' own considerable profits, either because Robins and his co-defendants were fiduciaries of the Plan who had breached their fiduciary duties from the outset or because they were liable on state law theories of fraud, unjust enrichment, and professional misconduct.

Turning to the federal claim, the central questions are whether Robins and his co-defendants were fiduciaries of the Plan and, if so, whether they breached any relevant duty. ERISA broadly defines a fiduciary, in 29 U.S.C. § 1002(21)(A), in the following terms:

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such a plan.

Plaintiffs—having previously argued to the IRS (in the letters of plaintiffs' counsel to the IRS dated January 6, 1994 and April 4, 1995) that defendants were not fiduciaries of the Plan—now reverse field and vigorously argue to this Court that defendants were fiduciaries.

■ Plaintiffs' first contention in this regard is that the defendants became fiduciaries at the very outset of the foregoing arrangements, by inducing Gunshor to rely on their expertise and representations in deciding to commit the Plan to Robins' proposals. Since, on this theory, Robins and his co-defendants had an obligation from the outset to pursue the foregoing transactions exclusively for the benefit of the Plan, plaintiffs seek, *inter alia,* disgorgement of the 85% of the proceeds from these transactions that were received by the defendants.

■ It is undisputed, however, that neither Robins nor any of the other defendants had any relationship with the Plan prior to Robins making his initial proposal to Gunshor in June, 1982. "When a person who has no relationship to an ERISA plan is negotiating a contract with that plan, he has no authority over or responsibility to the plan and presumably is unable to exercise any control over the trustees' decision whether or not, and on what terms, to enter into an agreement with him." *F.H. Krear & Co., Inc. v. Nineteen Named Trustees,* 810 F.2d 1250, 1259 (2d Cir.1987). *See also Cottrill v. Sparrow, Johnson & Ursillo,* 74 F.3d 20, 22 (1st Cir.1996). Nothing in the relationship or interaction of Gunshor and Robins changes this presumption. Plaintiffs' conclusory rhetoric aside, it is undisputed that Gunshor was a sophisticated investor and was perfectly capable of hiring independent advisors to review Robins' proposals. It follows that plaintiffs' initial argument must be rejected.

■ For similar reasons, the Court must also reject plaintiffs' fallback argument that defendants' proposal of the subsequent reductions in the mortgagees' obligations placed defendants in a fiduciary relationship from which they should not benefit. The reductions were arms-length proposals for modifications of the original, arms-length contractual arrangements, which Gunshor, on behalf of the Plan, was free to accept or reject. Gunshor accepted.

■ Plaintiffs further argue, however, that defendants did not limit themselves to making arms-length proposals but so insinuated themselves into the everyday implementation of the arrangements as to warrant a reasonable fact-finder in concluding that they exercised effective authority or control over Plan assets and thus qualified as fiduciaries under 29 U.S.C. § 1002(21)(A)(ii). The admissible evidence placed before the Court on this motion does not, however, warrant any reasonable juror in drawing such an inference. It shows, rather, that defendants' acts of implementation, such as when they prepared checks for Gunshor's signature or directed to whom and for how much payments should be made under the various agreements, were essentially non-discretionary in nature and often entirely ministerial. Moreover, even if there were a genuine issue as to whether

defendants manifested authority or control over Plan assets, plaintiffs have not adduced any material admissible evidence showing any breach of fiduciary duty with respect to such activity. If, as already discussed, the arms-length arrangements and modifications were themselves proper, defendants' activities for the purpose of effectuating those arrangements and modifications were likewise proper.[2]

 Finally, plaintiffs contend that defendant Robins, in assuring Gunshor that the Plan's participation in the aforementioned arrangements was "legal" and "kosher," undertook a fiduciary obligation that makes him liable for the taxes subsequently assessed against the Plan for unrelated business income, as well as for the counsel fees and accounting costs incurred in defending against the IRS's inquiries. Once again, however, plaintiffs' theory is unpersuasive. The Plan was fully in a position to make its own assessment of Robins' proposals, and, as mentioned, Gunshor, formerly a licensed securities broker with an M.B.A. from the Wharton School who himself had previously invested in real estate partnerships, was under no impediment to seeking independent legal advice as to the legal propriety of the proposals. Moreover, even assuming some sort of fiduciary obligation on Robins' part, there was no breach, for the IRS abandoned any claim that the arrangements violated any law and simply, in the end, chose to categorize the Plan's income differently from the way in which the Plan had, reasonably but unsuccessfully, argued it should be categorized. *See* Robins Dec., Exhs. 2, 3.

The Court has considered plaintiffs' other contentions and finds them equally without merit. Accordingly, for the foregoing reasons, defendants' motion for summary judgment dismissing plaintiffs' ERISA claims is granted. Since the Court declines to exercise supplemental jurisdiction over plaintiffs' state law claims, *see United Mine Workers v.*

*Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Morse v. Univ. Of Vermont,* 973 F.2d 122, 128 (2d Cir.1992), the Complaint will be dismissed in its entirety. Clerk to enter judgment.

SO ORDERED.

---

**2.** Plaintiffs' only admissible evidence that even arguably suggests a breach of fiduciary duty by defendants relates to Robins' recommending, in connection with the sale of one of the properties, that payments be made for brokerage services to a defendant-related entity. *See* Plaintiffs' Memorandum at 10. However, in their Local Rule

56.1 Statement, the Robins defendants assert that the sum of these commission payments amounted to less than the standard commission rate payable for such services, Robins Defs.' 56.1 Statement ¶ 90 (*see also* Robins Dec. ¶ 53), and plaintiffs, in their Rule 56.1 Statement, reference no facts that contradict this.