LEISURE TIME ENT., an Indiana corporation; Global Videos, Inc., d/b/a Trans Global Films, an Indiana corporation, Plaintiffs–Appellants,

v.

CAL VISTA; Sidney Niekerk; Lloyd Robinson, Defendants–Appellees.

No. 00–57005.
D.C. No. CV–94–2873–MRP(JGx).

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 12, 2002.

Decided May 21, 2002.

Before KOZINSKI and GOULD, Circuit Judges, and BREYER, District Judge.*

### MEMORANDUM **

1. The district court did not err in admitting the expert testimony of David Kravis and Jeffrey Kinrich. Kravis was a twenty-year veteran of the adult film industry with "specialized knowledge" and experience. *See United States v. Hankey,* 203 F.3d 1160 (9th Cir.2000). Kinrich merely applied basic accounting calculations to the estimates provided by Kravis.

2. The district court abused its discretion in awarding lost profit damages of $5,230,658.

We review a district court's award of damages for an abuse of discretion. *See Security Farms v. Int'l Bhd. of Teamsters,* 124 F.3d 999, 1015 (9th Cir. 1997). An award of lost profit damages, such as the one here, will be upheld if it is supported by "substantial evidence." *See*

---

* Honorable Charles R. Breyer, United States District Judge for the Northern District of California, sitting by designation.

** This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as may be provided by 9th Cir. R. 36–3.

*Humetrix, Inc. v. Gemplus*, 268 F.3d 910, 919 (9th Cir.2001). Under California law "[n]o damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and origin." Cal. Civ.Code § 3301.

In awarding $5,230,658 in damages, the district court explicitly credited David Kravis's estimate that each of the 252 Leisure Time Entertainment, Inc. ("LTE") features would have generated $25,000 in revenue.[1] Because Kravis's opinion was unsupported by substantial evidence, it was erroneous for the district court to rely on it. In particular Kravis's expert testimony, and by implication the district court's award of damages, fails to adequately account for the following evidence adduced at trial.

## A. Form and Timing of Sales

Cal Vista ("CVI") generally sold its rights in the LTE features to foreign distributors for a period of seven years for a fixed sum. Accordingly, after the contract was executed, CVI assumed no economic risk for a period of seven years. While compilations might affect the profits realized by the foreign distributor that purchased rights to the LTE features from CVI, compilations would not affect CVI's profits for the seven-year period.

Theoretically the introduction of compilations could affect the value of CVI's residual rights in the features. But as Kravis and other experts testified, adult features have very short shelf lives. Seventy-five percent of the revenue is captured in the first three years. Indeed, only about fifteen percent of all features have any renewal value at all. *See* Reporter's Transcript, July 15, 2000 at 86. And even those features that are renewed are typically renewed at a significantly reduced price—15 to 20 percent of the original price. *Id.*

CVI captured most of the home video revenue it could expect from licensing the LTE features upon the initial sale of rights to the foreign distributor. In many cases, these sales took place before any compilations were released anywhere. The CVI purchases from LTE commenced more than two years before illegal compilations entered the foreign market. Therefore the compilations should not have affected the profits generated by CVI's sales prior to mid–1990. With regard to these sales, any injury to CVI would involve the residual value of the features which, as discussed above, was minimal. While the parties failed to fully develop how many of the LTE features were licensed prior to mid–1990, the number is large enough to call the damages calculation into serious question.

## B. Comparability of Films

Kravis's opinion is based on the implicit assumption that the 23 films from Coastline Films, Inc. ("Kravis films") are comparable, in terms of potential to generate revenue, to the 252 LTE features acquired by CVI. In crediting Kravis's opinion, the Court implicitly endorsed this underlying similarity. However, the record reveals little evidence to support such a conclusion.

First, Kravis's expert report never expresses an opinion as to whether the Kravis films were similar, in any manner, to the 252 LTE features.[2] By contrast, the

---

1. The Kinrich report calculates damages in four distinct ways. While each method produced a similar result, only the Kravis estimate of $25,000 per feature produced a damages estimate of precisely $5,230,658.

2. Kravis admitted this at trial. *See* Reporter's Transcript, July 19, 2000 at 65–66.

report expresses the opinion that the 200 films that Coastline produced for the Spice Channel are similar to the 252 LTE features, an opinion that LTE apparently does not challenge.[3] The only evidence in the expert report that the Kravis films were comparable to the 252 LTE features is that they were produced over the same time period and on the same medium, video. At trial, Kravis offered the opinion that the Kravis films were comparable in economic value to the 252 LTE features. But this opinion appears to be based only on watching the 252 features for a total of 3.5 hours, and the evidence cited above. *See* Excerpts of Record 1013.

Besides the questionable basis for the opinion itself, there are other reasons to question the conclusion that the 23 Kravis films provided an appropriate metric for calculating damages. Mr. Charles Winick testified that the Kravis films and the LTE features were not comparable. Among other differences, Winick testified that the Kravis films were longer, had more popular actors and directors, and had more attractive titles. *See* Reporter's Transcript, July 20, 2000 at 63. While Winick was not qualified to give an opinion regarding the economic impact of these differences, the impact is obvious—all of these differences would suggest that the LTE features had less potential to generate revenue.

Winick's opinion is corroborated by evidence in the record. The production costs of the Kravis films averaged $14,500 per film. *See* Plaintiff's Exhibit 93. The production costs of the LTE features averaged $5,000. It is logical to infer that some of the extra $9,500 was spent on more recognized directors and bigger "stars." While the profitability of any particular feature can be difficult to predict, these factors would in the aggregate be expected to have a positive affect on revenues.

The state of the evidence regarding the comparability of the Kravis films and the LTE features is especially troubling because the district court's award of damages relied heavily on the existence of such comparability. This reliance resulted from the fact that direct evidence that the compilations were the proximate cause of injury to CVI was relatively undeveloped.

The proposition that distribution of compilations will hurt the profitability of underlying features is rather unremarkable. But the effect that the distribution of compilations will have on profits varies according to 1) the number of scenes from the features in the compilations, 2) whether the compilations and the features were released in the same territory, 3) whether the compilations and the features were released at the same time, and 4) the similarity in packaging of the compilations and the features. *See* Reporter's Transcript July 14, 2000 at 80–90. While neither party developed comprehensive evidence of these factors, it is clear that the overlap was less than complete. Some features were licensed in territories where compilations were never sold. Some features were licensed in territories where compilations came on the market only years later. And in some territories, the released compilations were composed of scenes from features other than those licensed in the territory. The district court erred by relying on the unsubstantiated opinion that the Kravis films were economically comparable to the LTE features.

---

**3.** According to the Declaration of Michael Kovacs, the average foreign revenue already generated by the CVI features was $4,243, while the average revenue earned by the 200 Spice Channel films overseas was $4,509.

Even if the Kravis films were of comparable economic value to the 252 LTE features, and as stated above there is significant evidence to suggest they were not, the Kravis films earned on average only $18,096—28 percent less than the $25,000 estimate used to calculate damages. Apparently the $6,904 per film difference was an estimate of revenue that could be expected from compilations, broadcast, Internet, DVD licensing, CD–ROM licensing, and Pay–Per–View. This estimate is based merely on speculation; the Kravis films had not generated such revenue.

## C. Residual Value

The district court also found that the 252 LTE features were "rendered valueless" by LTE's breaches of the purchase agreements. Findings of Fact and Conclusions of Law Regarding Damages for Breach of Contract at 11. Again there is evidence in the record to contradict this finding. For example, in 1995 CVI sold most of the 252 film library to a distributor in South Africa for $50,400. In light of the uncontested testimony that most films lose significant value after 3 years, this appears to be a significant level of residual value.[4]

## D. Conclusion

CVI paid a total of slightly more than $600,000 for the 252 LTE features—generally between $1,500 and $2,500 per film. Findings of Fact and Conclusions of Law Regarding Damages for Breach of Contract at 8. By their own admission, they have already earned $1,069,342 selling rights to those features—a healthy return. The testimony of Kravis suggests that they should have reaped $6,300,000, a tenfold return on their investment.

Such a return is not supported by substantial evidence. Accordingly, the damages award is hereby VACATED and REMANDED.

■ 3. LTE waived its right to a jury trial. *Feltner v. Columbia Pictures Television, Inc.,* 523 U.S. 340, 118 S.Ct. 1279, 140 L.Ed.2d 438 (1998) did not provide a basis for LTE to demand a jury trial after having previously waived the right twice. *Feltner* merely held that a party is entitled to a jury trial in the determination of statutory copyright damages. This is a right that LTE thought they already enjoyed when it was waived.

4. CVI neither waived nor abandoned its right to recover actual damages for breach of contract. CVI elected statutory damages after the district court held it was entitled to statutory damages. As the district court noted: "Having elected statutory damages, CVI could not seek double recovery by additionally seeking an award of damages for breach of contract." Findings of Fact and Conclusions of Law Regarding Damages for Breach of Contract at 17.

5. The district court did not abuse its discretion in retaining supplemental jurisdiction over CVI's state law claim for breach of contract. The breach of contract claim "derive[d] from a common nucleus of operative facts." *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Having invested considerable judicial resources in the case since it was filed in 1994, retaining jurisdiction "furthered considerations of judicial economy, convenience and fairness to litigants." *Id.* at 726, 86 S.Ct. 1130.

---

4. It is difficult to discern from the record, but it does not appear that illegal compilations were distributed in South Africa. If that is indeed the case, this example highlights the importance of a more detail proximate cause analysis.

6. Having vacated the damages award, we also vacate the attorney's fee award. The district court shall address attorney's fees upon determination of final judgment.

VACATED AND REMANDED.

---

*** This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as may be provided by Ninth Circuit Rule 36–3.